Malik Abdul **ALIM**, Plaintiff,

v.

Brendan T. **BYRNE**, et al., Defendants.

Malik Abdul **ALIM**, Plaintiff,

v.

Brendan T. **BYRNE**, Defendant.

Civ. A. Nos. 76–0499, 76–1661.

United States District Court,
D. New Jersey.

July 8, 1980.

Richard A. Levao, Shanley & Fisher, Newark, N. J., for plaintiffs.

Elaine W. Ballai, Deputy Atty. Gen., State of N. J., Trenton, N. J., for defendants.

## OPINION

DEBEVOISE, District Judge.

### I. *Procedural Background*

Civil Actions Nos. 76–0499, 76–1661 and 77–0058 each involve claims that during the course of their imprisonment at Trenton

State Prison the plaintiffs were deprived of their religious liberties protected by the First Amendment of the United States Constitution.

Malik Abdul Alim filed Civil Actions Nos. 76–0499 and 76–1661. In these actions he claims that two organizations of which he was the spiritual leader (United Against Racism, Discrimination and Social Injustice [UARDSI] and its affiliate, the Interdenominational Worship Temple of God) were and are religious bodies, that the Trenton State Prison authorities have discriminated against them by refusing to allow them to engage in congregate worship, by refusing to let inmates who are members of UARDSI meet with their spiritual leader, Dr. Alim, by failing to provide sufficient nutritious foods as alternatives to pork products, which UARDSI members cannot eat, and by forbidding UARDSI to purchase and sell to inmates food, such as bean pies, which the member inmates needed in order to supplement the prison diet.

Class action certification was granted in the two actions instituted by Dr. Alim and he was designated by an order of the Court entered January 12, 1977 as the representative of "all those inmates at Trenton State Prison who are or may become members of the Interdenominational Worship Temple of God". On February 28, 1977 these two actions, which previously had been consolidated, were further consolidated with Civil Action No. 77–0058, an action instituted by Emory X. Johnson (now known as Wali D. Muhammad). That action also raised issues concerning religious freedoms. An attorney was appointed to represent the class representative, Dr. Alim.

When the matter was called for trial, in the presence of both Dr. Alim (who was represented by his attorney) and Mr. Muhammad (who appeared *pro se*), it appeared that there were differences in the positions of the two plaintiffs and Mr. Muhammad stated that he did not wish to be bound by the verdict in Dr. Alim's cases. Therefore, with the consent of the two plaintiffs and the defendants, the Court ordered that Civil Action No. 77–0058 be severed from the other two actions.

After this severance there remained as defendants the following persons, sued individually and in the following capacities: Brendan T. Byrne, Governor of the State of New Jersey; Ann Klein, Commissioner of the Department of Institutions and Agencies; William H. Fauver, Director of Correction and Parole of the Department of Institutions and Agencies; Richard A. Seidl, Supervisor of the three adult prisons in the Department of Institutions and Agencies; Alan R. Hoffman, Superintendent of Trenton State Prison; Robert S. Hatrak, Superintendent of the Rahway State Prison; Alfred Richardson, Correction Officer at Trenton State Prison; Anthony C. Turner, Supervisor of Education at Trenton State Prison; Gary J. Hilton, Superintendent of Trenton State Prison; Calvin E. Neubert, Assistant Superintendent at Trenton State Prison; Gildo L. DePaolis, Chief Deputy Keeper of Trenton State Prison; Stanley Samuelson, Director of Professional Services of Trenton State Prison; and Nicholas Gregorio, Supervisor of the mailroom at Trenton State Prison.

The trial before a jury commenced on June 5, 1980. At the close of plaintiff's case the defendants moved to dismiss the entire case on the grounds that plaintiff had failed to establish that UARDSI and the Interdenominational Worship Temple of God were religious bodies. The motion was denied on the grounds that there was evidence on the basis of which the jury could conclude that the members of those related organizations formed and participated in them in the exercise of their religious beliefs, and that the prison authorities had unreasonably interfered with the exercise of religious freedoms protected by the First Amendment. The defendants also moved to dismiss as to each defendant on the ground that there was no evidence that he was responsible for any deprivation of constitutional rights of the members of the class. The motion was granted with respect to defendants Byrne, Klein, Hatrak, Richardson, Turner, Neubert, DePaolis and Gregorio. The motion was denied with respect

to defendants Fauver, Seidl, Hoffman, Hilton and Samuelson.

The remaining defendants presented their evidence and the matter was submitted to the jury. The jury was unable to agree upon a verdict and thereafter the parties agreed to waive a jury and submit the matter to the Court for determination on the trial record and briefs and arguments of the parties.

## A. *The Facts*

In 1975, plaintiff, Malik Abdul Alim, was an inmate at Trenton State Prison [TSP]. He took courses sponsored by Mercer County Community College and by Edison College. He had studied Islamic religion for many years and asserts that he speaks Arabic and a little Spanish. His title of "Doctor" was conferred by UARDSI, the organization of which he is now spiritual leader and which will be described below. He was released from prison on parole in November or December, 1977, but remains the leader of UARDSI and its affiliate, the Interdenominational Worship Temple of God.

It appears that Dr. Alim organized UARDSI in 1975. Its certificate of incorporation and various constitutions and statements of organization and principles are included among the trial exhibits. The aim of UARDSI and of the Interdenominational Worship Temple of God was and is to protect all people from racism, discrimination and social injustice, to conduct religious services at which believers in God of all religious persuasions can come together and which will preach "equal love for all, equal respect for all, and equal faith in all". (Exhibit P–7.)

Organizationally, UARDSI had a strict hierarchical structure. It was led by an executive president (or executive minister) under whom there were an executive vice-president, an executive secretary, and an executive treasurer. A security officer was provided for in the constitution, whose duties included providing safety for the organization and its officers. An investigation officer was designated "to check on everybody within the organization". It is provided in the constitution that "The executive president . . . has the final word in all organizational affairs or functions" and that the executive officials "will make the rules and regulations that all members will obey and abide by 100% percent or suffer the consequences". There was provision for senior members, junior members, associate members and anonymous members (Exhibit P–6; Exhibit D–7). From UARDSI's inception Dr. Alim has served as executive president or executive minister.

Although the documents establishing and governing UARDSI suggest that it was an organization which recognized all religions having a thiestic basis, the testimony made it clear that UARDSI is essentially a Muslim religion, which respects and tolerates other religions but which does not bring adherents of other faiths into full UARDSI membership privileges.

For about six months prior to October 1975 UARDSI operated with remarkable freedom within TSP. A room was made available for weekly worship attended by approximately fifty members. Dr. Alim testified that at that time there were fifty active members of UARDSI and perhaps one hundred associate members.

Under the pass system which then prevailed in the prison, Dr. Alim had permission to travel through the prison to consult with members of his organization. He maintained a checking account in which the members' contributions were deposited. The organization ordered food from outside the prison, bean pies apparently having been a favorite item, which members could purchase to supplement the prison diet.

In October 1975 UARDSI's various privileges were suddenly terminated. Congregate worship was no longer permitted. The pass system by which Dr. Alim could visit UARDSI members throughout the prison was eliminated. Inmate organizations were no longer allowed to collect dues or other payments from other inmates and were told to surrender checkbooks in their possession. UARDSI was no longer able to purchase bean pies for its adherents.

After Dr. Alim was released on parole in late 1977 he continued the work of UARDSI outside the prison, engaging in programs to assist released prisoners and conducting services and classes. At least two TSP inmates have requested that prison authorities allow Dr. Alim to visit with them as their spiritual advisor. This would have violated a prison policy of refusing (except in unusual circumstances) to permit former inmates to visit current inmates, and the request was denied. One inmate witness estimated that there are now perhaps fifty UARDSI members at TSP and additional members at other state prisons. The prison authorities who testified conclude that there are very few UARDSI members left at TSP and that there is little, if any, demand for UARDSI congregate worship.

There is no evidence which suggests that UARDSI preached violence or that its members participated in any of the untoward events which took place at the time of UARDSI's organization and early existence. However, UARDSI had the misfortune of coming on the scene at a time when TSP was in the throes of a serious crisis.

TSP's physical facilities place severe limits upon the kinds and number of group programs which can be conducted. Its construction was authorized in 1797 and it is now the oldest state prison facility still in use in the United States. It was built in accordance with the Pennsylvania theory of penology, which was considered humane and advanced at the time. Prisoners were kept in isolation for long periods during which they could meditate and presumably reform their ways. As a result mass movements of prisoners from one part of the prison to another was neither contemplated nor provided for. Thus, today the design of the prison requires that all movements from each wing be through a center area, limiting the number of persons who can participate in a prison movement at any one time.

Prisoners convicted of the most serious crimes and serving the longest terms are confined at TSP, with the result that its population is the most difficult to handle of any in the state prison system.

In 1975, according to the evidence in this case, the prison authorities had virtually lost control of the institution to factions of the Muslim movement. Passes had been issued widely among inmates, allowing unfettered movement by many inmates throughout the institution. A para-military unit of inmates, the Fruit of Islam (FOI), wore uniforms and acted as guards in the prison, establishing control over inmates and often asserting authority over prison guards at Muslim meetings held within the institution. Protection was bought and sold by inmates. There were abuses by prison guards and the morale of prison officers was low.

The situation came to a head in October 1975. At that time there was a high level of tension resulting from hostility between two Muslim sects. Members of the New World of Islam were imprisoned at TSP for the murder of Reverend James Shabazz, a minister of the Nation of Islam group.

On October 16, 1975, the members of the group which had killed Reverend Shabazz were assaulted by their rivals in a wild fracas during the course of which one inmate was killed and many others were wounded.

This October incident was followed by a shoot-out between guards and armed inmates in one of the prison tiers. As a result of these episodes the prison authorities determined to reassert full control over the institution. A new Superintendent, Gary J. Hilton, was assigned. All inmates were locked up and all activities, including all congregate religious services, were temporarily halted. It was at that point that UARDSI's permission to hold services was withdrawn.

All passes were called in to end the ability of certain inmates to move freely within the institution. Uniformed groups of prisoners such as FOI were banned and no prisoners were allowed to provide guard services or protection to other prisoners. Payments between prisoners were banned, because such payments were often the result of extortion. Sales of goods were frequently disguised extortion payments.

UARDSI, as described above, was one of the groups which was told to turn in its checkbook and that it could no longer sell goods inside the prison.

A traffic control system was established under which the staff, not the inmates, controlled prison movements.

In a word, all activities were stopped, including UARDSI's, and a new start was made. All groups were investigated and required to justify their activities before they were allowed to function once again. The resumption of activities was done slowly and carefully.

In May of 1976 three major religious groups (Protestant, Catholic and Jewish) were allowed to resume congregate worship. Because of the turmoil within the Muslim movement and the nonreligious activities undertaken by many Muslims, Muslim worship was not resumed at that time.

Muslim congregate worship was resumed under carefully drawn regulations on November 11, 1977 (Exhibit D–1). As in the case of the other religious groups, the individual sects which were a part of the overall Muslim faith, such as UARDSI, were not permitted to have separate services. One Imam, recruited from outside the prison and vouched for by the recognized authorities of the Muslim religion, served all the Muslims in the prison—just as one minister served all members of other major religious bodies.

The prison authorities investigated the various inmate groups which had operated prior to the shutdown. There were facets of UARDSI's governing documents and prior activities which led the authorities to conclude that UARDSI and the Interdenominational Worship Temple of God were not religious bodies, but were social and political organizations. Further, there were circumstances which led prison authorities to fear that UARDSI and the Interdenominational Worship Temple of God were paramilitary organizations disguised as religious bodies.

The UARDSI documents were, to a considerable extent, couched in political and social objective terms. Certain of its activities partook of a commercial nature—the selling of food within the prison. Dr. Alim had been an officer in the FOI and the governing documents of UARDSI could very easily be interpreted to countenance the control of the actions of the members by forceful measures. The existence of anonymous members was a disturbing feature, as none could tell whether these anonymous members were FOI members or members of other violent Muslim groups or factions. Further, Dr. Alim violated the requirement that all inmate groups surrender their checkbooks, and he continued to solicit funds from inmates.

The prison authorities have been confronted with a number of groups which have sought to evade the new prison restrictions by characterizing themselves as religious bodies. It becomes the responsibility of the prison officials to determine the genuineness of these claims and to determine what restrictions may be required even if the group is primarily of a religious nature.

The question to be resolved in the present case is whether the First Amendment religious rights of Dr. Alim and the UARDSI members were violated by the actions taken by the prison officials after October, 1975.

### B. *The Law*

The statute which plaintiff claims was violated reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C.A. § 1983.

The statute comprises one of the Civil Rights Acts enacted by the Congress under the Fourteenth Amendment to the Constitution of the United States. The Fourteenth Amendment to the Constitution provides that:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The statute 42 U.S.C. § 1983 was enacted for the purpose of protecting a person from the invasion of his or her constitutional rights. One such constitutional right is set forth in the First Amendment of the United States Constitution, which provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." By the Fourteenth Amendment of the United States Constitution the First Amendment is made applicable to the states.

The initial question in this case is whether the activities of the plaintiffs as UARDSI members were religious in nature and thus subject to First Amendment protection.

■ Certain of the actions of plaintiffs were clearly not religious in nature. The maintenance of a checkbook and the sale of food to UARDSI members were not entitled to First Amendment protection. The prison authorities went to considerable lengths to advise inmates when pork would appear on the menu and to provide substitute dishes on such occasions. The evidence could not support a finding that inmates who abstained from pork were inadequately nourished and required food from the outside in order to maintain the diet required by their religion; *cf. Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975).

A religion can be viewed as a community, congregation or a group, with a cult of ritual and ceremony, a code of morality or standards of law and discipline for the group, with a creed of beliefs with respect to God, however He may be named, *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Religious belief can also be less structured and consist of belief that is sincere and meaningful and occupies a place in the life of its possessor parallel to

that filled by the orthodox belief in God, *Theriault v. Silber*, 453 F.Supp. 254 (W.D. Texas 1978).

It is understandable, given the circumstances which prevailed at TSP in 1975 and 1976, that the TSP authorities might reasonably have concluded that UARDSI and the Interdenominational Worship Temple of God were not religious groups, and that the theological words and practices of the two organizations were mere subterfuge.

■ In the light of hindsight, however, and on the basis of the evidence adduced at a 1980 trial, I conclude that plaintiffs have established by a preponderance of the evidence that UARDSI and the Interdenominational Worship Temple of God are religious organizations, and that plaintiffs' beliefs and worship practices in conformity with the tenets of these organizations are religious in nature.

The next question is whether the regulations which defendants imposed upon the UARDSI members unlawfully deprived them of their First Amendment right to the free exercise of their religion; *see O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973).

■ While prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison, these retained rights are necessarily limited by the fact of confinement as well as by the legitimate goals and policies of the penal institutions, *see Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). The Court has recognized that maintaining institutional security and preserving internal order and discipline are legitimate and essential goals of the prison administration which may require limitation of the retained rights. *Pell v. Procunier, supra*, 417 U.S. at 823, 94 S.Ct.

at 2804; *Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S. at 129, 97 S.Ct. at 2539; *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). The Court has also noted that prison administrators are to be accorded wide-ranging deference in their policies and practices which, in their judgment, are needed to preserve internal order. *Procunier v. Martinez, supra,* at 404–05, 94 S.Ct. at 1807.

■ Applying these principles, I conclude that defendants have established by a preponderance of the evidence that the limitations placed upon the religious activities of UARDSI and its members were reasonable under the circumstances which I described above. A prisoner's right to practice the religion of his choice is not absolute. The individual's exercise of religious rights may, and often does, collide with the practical necessity of managing and administering a complicated penal community. The restrictions placed on UARDSI's group activities (and upon the group activities of other inmate organizations, both religious and secular) were reasonably related to the security needs of TSP and the State's responsibility to maintain order and discipline therein, *LaReau v. MacDougall,* 473 F.2d 974 (2d Cir. 1972); *Wilson v. Prasse,* 463 F.2d 109 (3d Cir. 1972).

In 1975, 1976 and 1977 conditions in the prison required prompt and drastic action to prevent catastrophe—the total loss of control by prison authorities and death and injury to inmates and guards alike. After 1977, when the prison authorities considered it safe to resume Muslim congregate worship, it was still within their discretion to determine the manner in which the limited space and time for group gatherings could best be allocated among the inmates' secular and religious activities. Provision was made for congregate worship by the major religious bodies—including the Muslims, of which UARDSI is a part. It would have been totally impractical to make provision for each subgroup or sect. There is no requirement that a prison administration must provide space and time for every group, *Jones v. Bradley,* 590 F.2d 294 (9th Cir. 1979).

■ Nor do I conclude that refusing to permit Dr. Alim to meet with inmate members of UARDSI is such an unreasonable regulation as to violate constitutional rights. The prohibition against former inmates visiting present inmates in TSP, absent compelling circumstances, has a basis in sound policy considerations relating to the security of the institution. These considerations outweigh the interest of UARDSI members in conferring with Dr. Alim, *Gittlemacker v. Prasse,* 428 F.2d 1 (3d Cir. 1970).

The foregoing should not be deemed as a holding that the prison authorities do not have a continuing obligation to reexamine periodically their policies with respect to UARDSI and the Interdenominational Worship Temple of God. If, in the future, it should develop that this group within the Muslim religion should acquire a large following at TSP, and/or if conditions within the prison (or at the new prison facility which will replace TSP in the next year or so) should make it feasible for a larger number of inmate groups to meet, the prison authorities should, of course, examine future requests by UARDSI members in the light of such changed conditions and applicable law relating to the free exercise of religion in prisons.

At this time, however, I find that there have been no violations of the religious liberties of the members of the plaintiff class, and judgment will be entered for the remaining defendants.