James M. THOMPSON, et al., Plaintiffs-Appellants,

v.

COMMONWEALTH OF KENTUCKY, et al., Defendants-Appellees.

No. 81–5156.

United States Court of Appeals, Sixth Circuit.

Argued March 22, 1982.

Decided July 26, 1983.

Leslie W. Abramson, University of Louisville School of Law, Joseph S. Elder, II, Legal Aid Soc., Inc., Paul Porter (argued), Louisville, Ky., for plaintiffs-appellants.

Paul F. Isaacs, Barbara H. Willett (argued), Dept. of Justice, Frankfort, Ky., Adjoa Burrow, Sp. Litigation Section, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., Oliver H. Barber, Jr., Thomas Banazynski, Gittleman, Charney & Barber, Louisville, Ky., Richard Burr, Southern Prisoner's Defense Committee, Nashville, Tenn., John L. Smith, U.S. Atty., Hancy Jones III, Asst. U.S. Atty., Louisville, Ky., for defendants-appellees.

Before MERRITT and JONES, Circuit Judges, and WEICK, Senior Circuit Judge.

MERRITT, Circuit Judge.

In this prisoners' rights case,[1] the plaintiffs—Muslim inmates who follow the Islamic religion—claim that the defendants have infringed their First Amendment right to freedom of religion by denying equal religious liberty and have engaged in religious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Upon cross-motions for summary judgment, the District Court found that no issues of material fact remained in dispute and awarded judgment in favor of the defendants. Plaintiffs appeal that decision, contending that a material issue—the actual number of inmates who regularly use the prison chapel—must still be determined. Because we do not believe that the case requires such a determination, we affirm the judgment of the District Court.

The District Court rejected the Muslim inmates' claims that the prison officials acted unconstitutionally in restricting plaintiffs' opportunities for group prayer and allocating facilities and funds among the various religious groups represented in the prison. These claims stem from the following undisputed allegations: that the prison administrators have allocated 23½ hours of chapel time per week for Christian groups while setting aside only 6½ hours per week for the Muslim inmates; and that the institution has hired one part-time and two full-time Christian Chaplains (all three of whom are Baptists) while providing no funds for a Muslim leader. Thus the basic claims in the case involve equality of treatment.

Although the prison administration had formerly given the Muslim inmates access to a room where they could meet for group prayer, the District Court found that demands by several other religious groups for similar rooms had prompted the administration to revoke plaintiffs' special room privileges in order to preserve equal treatment of all religions. The administration did, however, allow the Muslims to meet regularly for group prayer outside the chapel. The District Court found that approximately 25 Muslim inmates use the chapel. Citing Chaplain Dent's deposition that approximately 190 inmates "are involved in some way in the chapel," the court concluded that the difference in the amounts of time allocated to the Christian and Muslim groups did not amount to a deprivation of the latter's First Amendment right to exercise their religion, especially in view of one of the named plaintiffs' testimony that the Muslim inmates could fulfill their prayer obligations by praying together in the dormitories.

Similarly, the District Court found that the prison's policy regarding the allocation of chapel time and funds for religious activities did not violate the Equal Protection

---

[1] The case was commenced as a class action on behalf of all prisoners who are or will be confined in the Kentucky State Reformatory at LaGrange, Kentucky. Alleging that the totality of the conditions in the institution fall "beneath standards of human decency, inflict unnecessary suffering on prisoners, create an environment which threatens prisoners' mental and physical well-being" (Amended Complaint at 2), the complaint challenged many specific conditions, such as the adequacy of the prison's physical facilities, inmate programs, classification system, medical care, and various regulations. During pre-trial proceedings, the District Court issued a consent decree that disposed of most of the issues raised by the complaint. This appeal concerns only plaintiffs' religious liberty claims, which the consent decree did not resolve.

Clause because the allocations reflected the different numbers of Christians and Muslims who used the chapel. The court further observed that the prison policy of denying the Muslims a separate room for group prayer actually represented an attempt to treat all religious groups equally. Accordingly, the court found that the plaintiffs had failed to demonstrate any discrimination by the prison authorities against the Muslim religion.

Plaintiffs renew both the free exercise and the equal protection arguments on appeal. They have not, however, argued that defendants' manner of allocation of resources for religious activities constitutes a violation of the Establishment Clause of the First Amendment, and we, therefore, do not reach this issue. The question whether Kentucky has imposed the Baptist denomination of the Christian religion on the inmates at the LaGrange Reformatory by hiring only Baptist ministers and has thereby violated the Establishment Clause, see A. Schwartz, *No Imposition of Religion: The Establishment Clause Value*, 77 Yale L.J. 692, 720 (1968), leads into a difficult area, an area of tension between the Free Exercise and Establishment Clauses of the First Amendment. *See* L. Tribe, *American Constitutional Law* 815 (1978) (noting First Amendment difficulty presented by government's employment of military chaplains). We, therefore, confine ourselves to consideration of the narrow free exercise and equal protection arguments that plaintiffs have presented to us and reserve other questions for another day.

### Free Exercise Claim

 While in prison, inmates retain certain constitutional rights, including the right to exercise their religious beliefs. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). However, the proposition that "inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Although prisoners obviously do not retain the same freedom to exercise their religion as they would in the world outside the prison, they may not be denied basic rights of conscience.

In *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), the Supreme Court reversed the dismissal of a complaint alleging that prison officials had denied a Buddhist inmate access to the prison chapel; had placed him in solitary confinement on a diet of bread and water for two weeks because he had shared his Buddhist religious material with other inmates; and had prohibited him from corresponding with his religious advisor. The Court held that Cruz's complaint stated a cause of action under the Free Exercise Clause. Similarly, in *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), the Court recognized a cause of action on the part of an inmate who claimed that, because of his religious beliefs, he had been denied permission to purchase certain religious publications and other privileges accorded other inmates.

 In the instant case, by contrast, plaintiffs do not claim that they have been denied the opportunity to practice their religion or that they have incurred punishment for doing so. On the contrary, plaintiffs concede that they are permitted to use the chapel 6½ hours per week and that the administration admits a Muslim leader from outside the prison to assist them in practicing their religion. *See* Deposition of Kevin Louis Jones, a/k/a Farid Abdul Rashid Muhammad at 59. Because plaintiffs have not been denied any basic right of conscience, we hold that they have failed to demonstrate any violation of the Free Exercise Clause. That provision does not require the prison officials to grant the Muslim inmates more than 6½ hours of chapel time per week. Nor does it require the defendants to provide a Muslim leader at state expense any more than it requires them to provide a Catholic Priest or a Jewish rabbi or a minister for all of the various denominations of the Protestant religion. *See Bethea v. Daggett*, 329 F.Supp. 796 (N.D.Ga.1970), *aff'd*

*per curiam,* 444 F.2d 112 (5th Cir.1971) (no free exercise violation where Muslim inmates permitted to hold two meetings per week, select one of their number to serve as religious leader, and reproduce and distribute religious materials). The Free Exercise Clause guarantees a liberty interest, a substantive right; that clause does not insure that all sects will be treated alike in all respects.

### Equal Protection Claim

Although plaintiffs concede that they have not been barred from pursuing their religious beliefs, they argue that the prison officials have given them a disproportionately small share of the resources available for religious activities. The District Court rejected this claim because it found that the Muslim inmates constituted only 25 out of the approximately 190 inmates who used the chapel. Plaintiffs maintain that the latter figure does not reflect the number of inmates who use the chapel *on a regular basis,* the number that, according to plaintiffs, is the relevant figure for determining whether an equal protection violation has occurred. Because the record does not contain such a figure, plaintiffs request that the case be remanded to the District Court for determination of "the actual number of Christians and Muslims" in the prison. (Plaintiffs' brief at 16.)[2]

We reject plaintiffs' argument for several reasons. First, we do not think that either the prisons or the courts must engage in the type of strict numerical analysis that plaintiffs propose or create a system of ratios or quotas in order to comply with the dictates of the Equal Protection Clause. Requiring prisons to maintain comprehensive records as to the religious composition of their populations and to allocate resources for religious activities accordingly would undoubtedly spark countless claims by various groups that they were not receiving their

fair share. Moreover, predicating resource allocation on such an elusive standard as the numbers of regularly practicing inmates would compel prison officials and courts to scrutinize the consistency of individual inmates' religious practices and to decide controversies regarding the precise contours of the various competing religious groups. Furthermore, the constant turnover of prison populations would render wholly impracticable any attempt to require that the religious resource allocation scheme conform exactly to the denominational distribution present in a prison at any given time. Adoption of plaintiffs' position would, therefore, embroil the prisons and courts in dangerous and inappropriate areas of inquiry and would prove exceedingly difficult to implement in an orderly and even handed fashion.

Second, plaintiffs base their equal protection argument on the following passage from *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972):

If Cruz was a Buddhist and if he was denied a reasonable opportunity of pursuing his faith *comparable* to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, then there was palpable discrimination by the State against the Buddhist religion, established 600 B.C., long before the Christian era. The First Amendment, applicable to the States by reason of the Fourteenth Amendment, *Torcaso v. Watkins,* 367 U.S. 488, 492–493 [81 S.Ct. 1680, 1682–1683, 6 L.Ed.2d 982], prohibits government from making a law "prohibiting the free exercise" of religion. If the allegations of this complaint are assumed to be true, as they must be on the motion to dismiss, Texas has violated the First and Fourteenth Amendments.

(emphasis added) (footnote omitted) Citing the Court's use of such terms as "comparable" and "palpable discrimination," plain-

---

**2.** Plaintiffs did submit several affidavits by Muslim inmates who testified that they had rarely or never seen more than 25 Christians in the chapel at any one time, although they do not state that the same 25 Christians always use the chapel. Requesting only that this Court remand the case for determination of the actual number of regularly practicing Christians and Muslims, plaintiffs apparently concede that the figures contained in their affidavits do not compel a grant of summary judgment in their favor.

tiffs attempt to invoke what they perceive as a *Cruz* mandate against all unequal treatment of inmate religious groups by prison officials.

Plaintiffs have misread *Cruz* and have, therefore, erroneously cited *Cruz* as the basis for using a numerical standard under the Equal Protection Clause. Contrary to plaintiffs' assertions, *Cruz* was not decided on equal protection grounds; the Court's reference to the Fourteenth Amendment in the passage quoted above pertains only to the incorporation of the First Amendment within the Fourteenth under the Due Process Clause. In a footnote to this passage, the Court emphasized that it was not adopting any broad or strict equal protection principle to govern the religious free exercise rights of prison inmates:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear or penalty.

*Id.* As discussed above, Cruz alleged that the prison authorities had denied him access to the chapel and had actually punished him for exercising his religion. If the Equal Protection Clause played any role in the case, it was only to the extent that Cruz claimed to have been deprived of the right to a reasonable opportunity—comparable to that afforded other inmates—to exercise religious freedom without fear of penalty. In reaching its decision, the Court was simply following the established practice of closely inspecting governmental activity that is claimed to be inconsistent with a fundamental right, namely, the right to exercise one's religion, a right that, according to Cruz's allegations, had been violated. *See* L. Tribe, *American Constitutional Law* 1002 (1978).

In the instant case, however, plaintiffs have not been denied that fundamental religious liberty. *See* discussion, *supra.* The limitations that the prison administration has imposed on them do not subject them to such disparate treatment relative to the Christian inmates as to penalize them for pursuing the Muslim religion. The defendants' allocation scheme does not represent such an unreasonable exercise of their discretion to distribute limited resources in a prison setting as to violate the standard described in *Cruz.* We again emphasize that we are not presented with, and do not decide, any claim under the Establishment Clause or any argument under the Equal Protection Clause except the plaintiffs' argument based on the *Cruz* case. Accordingly, we affirm the District Court's grant of summary judgment in favor of the defendants.

NATHANIEL R. JONES, Circuit Judge, dissenting.

Because I view the issues in this case as being inappropriate for summary judgment disposition, I must respectfully dissent. In ruling on a motion for summary judgment, a district court must analyze such a motion using "extreme caution for it operates to deny a litigant his day in court." *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.1979). Since the function of this motion is *solely* to determine whether there exists an issue of fact to be tried, the district court must examine the entire record before determining that no genuine issue exists. *United States v. Articles of Device, etc.,* 527 F.2d 1008, 1011 (6th Cir.1976).

The appellants submitted affidavits which tended to show that of the inmates at this correctional facility, only 20 to 25 Christian inmates used the chapel on a regular basis while 25 to 30 Muslim inmates used the chapel. The institution submitted an affidavit of one of the prison chaplains who attested that approximately 190 inmates use the chapel. This conflict to the actual number of inmates who request chapel time is crucial to a determination of whether the institution is allocating its facilities in an evenhanded manner such that

no religious denomination is given preferential treatment. In light of this contradiction in the affidavits, I think this matter was inappropriate for summary disposition.

Additionally, I believe the majority opinion misreads *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), as recognizing a First Amendment freedom of religion violation in the prison context *only* when the limitations imposed by the prison administration subject the Muslim inmates to such disparate treatment in relation to the Christian inmates as to penalize them for pursuing their religion. My reading of *Cruz* reveals that implicit within the court's analysis were considerations of the inherent establishment clause concerns that may be implicated in the prison setting. This is necessarily so because when a state institution fails to afford inmates of various denominations *comparable* opportunity to pursue their faith, the giving of preferential treatment to one religious denomination constitutes the basis for an establishment clause violation. As the Supreme Court affirmatively stated in *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Id.* 102 S.Ct. at 1683. I construe this to mean that when a state prison institution allocates religious facilities in an unevenhanded manner, a threshold establishment problem is presented. Thus, the mere fact that the Muslim inmates have not been *denied* the opportunity to practice their religion does not mean that no First Amendment violation has occurred.

Furthermore, I construe *Cruz* as requiring that a reasonable opportunity to pursue one's faith encompasses some type of balancing on the part of the prison administration. My construction is based upon the following passage that is taken from the *Cruz* opinion:

> We do not suggest, of course, that every religious sect or group within a prison— *however few in number*—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith *regardless of size;* nor must a chaplain, priest, or minister be provided *without regard to the extent of the demand.* But reasonable opportunities must be afforded to all prisoners *to exercise the religious freedom guaranteed by the First and Fourteenth Amendments* without fear of penalty.

405 U.S. at 322 n. 2, 92 S.Ct. at 1081 n. 2 (emphasis supplied). I think the Court's constant reference to the *number* and *size* of the religious group and the *extent of their demands* indicates its concern that when the group of inmates who practice a nonconventional religion are significant in number and the extent of their demands are not unreasonable, their requests should be balanced against the state's legitimate exercise of its power to run its penal system. Thus, to the extent that the prison's regulations regarding the use of the chapel limit the Muslim inmates' exercise of their religious freedoms, they must be justified by "important or substantial governmental" interests. *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1973). *Accord, Weaver v. Jago,* 675 F.2d 116, 119 (6th Cir.1982); *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975).

Another word is in order. I am unpersuaded by the policy assertions advanced by the majority as justification for circumventing the clear rules which govern the grant of summary judgment. It is not for this Court, at this stage, to make a case for prison officials. The majority's fear of *"embroil[ing] prisons and courts in dangerous and inappropriate areas of inquiry"* is not a valid basis for depriving litigants of their entitlement to prove their claim that the state is unconstitutionally exercising its power. The concerns cited by the majority were presumably, or at least should have been, explored and weighed by the prison officials at the inception of the program. This Court is in the business of interpreting the Constitution and protecting rights arising thereunder, not shielding prison officials from the administrative complexities and other consequences growing out of policy determinations which they initiate.

The majority seemingly abhors the fact that numbers may be involved here. The simple fact is that a consideration of numbers is one way the appellants have of demonstrating the claim they make. To that extent numbers become a fact to be confronted in considering the allegations in the complaint. Since the numbers are disputed, an issue of fact exists.

Thus, in light of my construction of the mandates of *Cruz v. Beto, supra,* and my conclusion that summary judgment was inappropriate due to the issue of fact regarding the number of inmates who use the chapel, I would reverse the judgment of the lower court.