Edwin C. UDEY, Petitioner,

v.

D.C. KASTNER, Warden, et al., Defendants.

No. TX-85-175-CA.

United States District Court, E.D. Texas, Texarkana Division.

Sept. 24, 1986.

Richard N. Dodson, Texarkana, Ark., for petitioner.

Dane Smith, Asst. U.S. Atty., Tyler, Tex., Martin Carlson U.S. Dept. of Justice, Washington, D.C., for defendants.

HALL, District Judge.

Today this Court must decide whether the federal prison system is constitutionally required to provide Petitioner Edwin Udey with an "organic diet". Udey contends that he must be fed the proscribed fare because his diet is mandated by sincere religious beliefs. *U.S. CONST. amend. I (free exercise clause).*

On November 1, 1985, this Court adopted the Report and Recommendation of United States Magistrate Harry W. McKee which concluded that "the beliefs of the petitioner are not sincerely held religious beliefs [and that] [t]herefore, the right to partake of his specific diet is not protected by the free exercise clause of the First Amendment." On appeal, The Court of Appeals reversed and remanded, concluding that Udey's beliefs are sincerely held and religious in nature. *Udey v. Kastner, Warden, Et Al.,* 805 F.2d 1218 (5th Cir.1986), reh'g granted (July 9, 1986). The case was remanded "for an evidentiary hearing to determine whether meeting appellant Udey's religious dietary requirements would place an undue burden on the prison system and whether there is any good reason not to provide him with food that complies with his religious diet." Jurisdiction was retained for final disposition on the merits after remand.

Pursuant to the Order of Remand an evidentiary hearing was held in Texarkana, Texas, on July 16, 1986. Based on the evidence introduced at the July 16th hearing, the court concludes that Udey's religious dietary demands place an undue burden on the penal system to the extent that there is good reason not to provide him with his requested religious diet.

I.

## THE TEST

A prisoner retains the right to exercise his religion while in prison. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Thompson v. Com. of Ky.,* 712 F.2d 1078, 1080 (6th Cir.1983); *Mukmuk v. Commissioner of Dept. of Correctional Services,* 529 F.2d 272, 275 (2nd Cir.1976), cert. denied, 426 U.S. 911, 96 S.Ct. 2238, 48 L.Ed.2d 838 (1976). However, a prisoner's First Amendment free exercise right is not absolute. *Hudson v. Palmer,* 104 S.Ct. at 3199; *Bell v. Wolfish,* 441 U.S. 520, 545–546, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). In fact, even outside of the prison gates, religious liberty may be limited if overridden by a valid governmental interest [*Goldman v. Weinberger, et al.,* — U.S. ——, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983); *Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310 (5th Cir. 1977) cert. denied 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978)], although more restrictive measures on religious practice may be imposed in the prison than in the nonprison setting and withstand constitutional muster. *Bell v. Wolfish,* 441 U.S. at 545–546, 99 S.Ct. at 1877; *Childs v. Duckworth,* 705 F.2d 915, 920 (7th Cir. 1983); *Thompson v. Com. of Ky., supra* at 1080; *Kennedy v. Meacham,* 540 F.2d 1057, 1061 (10th Cir.1976); *Cochran v.*

*Rowe*, 438 F.Supp. 566, 570 (N.D.Ill.1977). Even where the practice of a clearly recognized religion is involved, claimed religious rights may be modified where the state has valid reasons for its actions. *Childs v. Duckworth*, 509 F.Supp. 1254, 1260 (N.D. Ind.1981), aff'd 705 F.2d 915 (7th Cir.1983). As our Chief Justice-Designate stated in *Bell v. Wolfish*, 441 U.S. at 545–546, 99 S.Ct. at 1877;

> " 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' The fact of confinement as well as the legitimate goal and policies of the penal institution limits these retained constitutional rights. There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application'." (citations omitted).

In evaluating whether or not Udey is entitled to the diet he requests, the Court applies a two part balancing test set forth in First Amendment free exercise clause jurisprudence. *Africa v. Com. of Pa.*, 662 F.2d 1025, 1029–1030 (3rd Cir.1981), cert. denied 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982). The threshold inquiry involves determining whether or not the avowed beliefs are (a) sincerely held and (b) religious in nature. If the Court determines that petitioner's claim is based on a sincerely held religious belief, then a second inquiry must be made to determine whether or not there is any governmental interest of sufficient magnitude to outweigh the prisoner's free exercise claim. The Remand Order states that the governmental interest in this case must rise to the level of avoidance of an "undue burden on the prison system" or some other "good reason" in order to outweigh Udey's request.

## II.

## GOVERNMENTAL INTERESTS

Recognizing that the Honorable Court of Appeals has concluded that Udey's requested diet is based on sincere religious beliefs, the Court makes the following *Supplemental Findings of Fact* and *Supplemental Conclusions of Law:*

## SUPPLEMENTAL FINDING OF FACT NO. 1

### COST

It is undisputed that it would cost substantially more money to feed Udey his requested diet than it costs to feed either a prisoner who is not on a religious diet or a prisoner currently receiving a religious diet. Cost is a valid governmental interest to be taken into account when evaluating prisoner free exercise claims. *Walker v. Blackwell*, 411 F.2d 23, 26 (5th Cir.1969); *Cochran v. Sielaff*, 405 F.Supp. 1126, 1128 (S.D.Ill.1976).

Ray O. Berry, Assistant Food Services Administrator at the Federal Correctional Institute (hereinafter "F.C.I."), Texarkana Texas, testified that the prison is allocated $2.27 for each inmate's daily food expenses (Tr. 164, 1. 24–25), and that it would cost approximately $5.00 per day to feed (includes cost of distilled water) Udey, exclusive of extra costs which would be incurred for other items such as additional staff time and storage. (Tr. 179, 1. 12).

While it is true that the prison system also spends approximately $5.00 per day to feed a prisoner participating in the "common fare" program (Tr. 111, 1. 5–11), a pilot program devised to accommodate as many inmate religious dietary requests as possible in a cost-wise manner (Tr. 58, 1. 18–60, 1. 8; 89, 1. 9–23), the additional administrative costs involved in meeting Udey's demands (i.e. staff time, storage, etc.) would raise the expense of feeding Udey well above that of feeding a "common fare" participant. (Tr. 100, 1. 15–16). Referring specifically to the diet outlined by Udey in his affidavit, J. Michael Quinlan, Deputy Director of the United States Bureau of Prisons, testified that:

> "... this particular religious diet would cost tremendously much more mon-

ey.... As compared to the average, extra cost of a religious diet" (Tr. 93, 1. 1–3, 1. 5–6)

In fact, according to Ray O. Berry, Assistant Food Services Administrator, it would cost the prison system a total in excess of Fifteen Thousand Dollars ($15,000.00) per year to accommodate Udey's demands. (Tr. 182, 1. 1–23; Tr. 194, 1. 4–14).

The medical evidence discloses that Udey is currently subsisting on a nutritional supplement (Tr. 131, 1. 3–132, 1. 25); holds a light duty job at the F.C.I. (Tr. 133, 1. 23–134, 1. 4); and is in "good health" (Tr. 136, 1. 23).

## SUPPLEMENTAL CONCLUSION OF LAW NO. 1

Certainly it is an understatement to say that such an enormous expense places an "undue burden on the prison system" and constitutes "good reason" not to provide Udey with food that complies with his religious diet.

## SUPPLEMENTAL FINDING OF FACT NO. 2

### SECURITY

"[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves". *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

Various prison personnel testified that meeting Udey's demands would create additional security problems at the prison. J. Michael Quinlan, Deputy Director of the United States Bureau of Prisons testified that security problems can arise, and in fact have arisen (Tr. 84, 1. 4–23), when an inmate is given a diet different than that received by the general prison population: hostility (Tr. 83, 1. 13–19); theft (Tr. 83, 1. 19–20); and the creation of a black market in these special food items (Tr. 83, 1. 22–25). Keith Hall, Executive Assistant to the Warden at F.C.I. testified that accommodating Mr. Udey would create a "... security problem, problem[s] with contraband, thefts of the food products, where we

would store it". (Tr. 153, 1. 23–24). Finally, the testimony of Ray O. Berry, Assistant Food Services Administrator at F.C.I., also relates the institutional concern with "pilferage" of these "high demand [food] items". (Tr. 169, 1. 21; Tr. 153, 1. 23–24; 154, 1. 13–18).

Justice Rehnquist has stated that "... maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of ... prisoners ...". *Bell v. Wolfish*, 441 U.S. at 546, 99 S.Ct. at 1878. The government need not show a present danger to security but merely a threat of potential violence or disruption to institutional security. *Caldwell v. Miller*, 790 F.2d 589, 599 (7th Cir.1986). Additionally, this Court is in agreement with the Chief Justice-Designate's view that Courts should defer to prison administrators in the area of prison security. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125–126, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977); *Bell v. Wolfish* 441 U.S. at 544 and at 547–548, 99 S.Ct. at 1876, and at 1878–79; *Cruz v. Beto*, 405 U.S. at 321 and at 325, 92 S.Ct. at 1081, and at 1083 (Rehnquist, J. dissenting); *Mathes v. Carlson*, 534 F.Supp. 226, 227 (E.D.Mo. 1982).

## SUPPLEMENTAL CONCLUSION OF LAW NO. 2

This Court, therefore, concludes that security concerns place an "undue burden on the prison system" and constitute "good reason" not to provide Udey with food that complies with his religious diet.

## SUPPLEMENTAL FINDING OF FACT NO. 3

### ADMINISTRATION

The "practical necessity of managing and administering a complicated penal community" is a valid governmental interest which can collide with a prisoner's exercise of religious rights. *Alim v. Byrne*, 521 F.Supp. 1039, 1045 (D.N.J.1980)

Udey's diet is set forth by affidavit marked Petitioner's Exhibit F–1 (Tr. 6, 1. 12–15; 7, 1. 5–10). Prisoner Udey prepared the affidavit two (2) days after his arrival at F.C.I., and made subsequent additions (which are highlighted) immediately prior to the initial hearing before the Magistrate on September 6, 1985. In order to avoid repetition, the Court will not discuss individually the items listed in the affidavit, as that information is set forth in the Report and Recommendation filed September 30, 1985. Suffice it to say that the diet consists mainly of "organic" fruits, juices, vegetables and meats; raw milk; and distilled water. Udey testified that his dietary beliefs are based on the scriptures (Magistrate Tr., 171, 1. 20; 172, 1. 22–173, 1. 9; 174, 1. 17–19) and on his personal communications with God (i.e. "... His spirit talk to my spirit man ..." at Magistrate Tr., 171, 1. 25–172, 1. 1; Magistrate Tr., 171, 1. 21–172, 1. 9). Mrs. Udey testified that she and her husband hold similar religious beliefs (Magistrate Tr., 18, 1. 15–19) and that the penalty for dietary noncompliance would be to be cursed and to be cut off from the Kingdom of Heaven, a fate "worse than death itself". (Magistrate Tr., 18, 1. 9–10). Udey has consumed foods which do not conform with his diet because, he explained, his body required it. (Magistrate Tr., 209, 1. 16–210, 1. 10; 213, 1. 21–25). Udey stated at several points that he had not violated his diet (Magistrate Tr., 196, 1. 6–8; 210, 1. 11–13, 214, 1. 20); yet, the record reflects that Udey has confoods which do not conform with his diet. (Magistrate Tr., 209, 1. 13–210, 1. 10; 211, 1. 16–212, 1. 20; 240, 1. 17–243, 1. 12; *see also* District Court Tr., 32, 1. 22– 33, 1. 14). On July 16, 1986, Udey testified that he had been following this diet for approximately ten (10) years prior to his incarceration (Tr. 33, 1. 20–22); however, on September 6, 1985, the testimony was that Udey had held his sincere religious beliefs regarding food consumption "at least thirty or thirty-five years". (Magistrate Tr., 172, 1. 17–18; 170, 1. 13–172, 1. 21).

After listening to the testimony, the Court is persuaded that, from an administrative standpoint, it would be nearly impossible to provide Udey with his requested diet. A major obstacle in providing Udey with his singular religious diet is that Udey himself is uncertain about its contents, as well as the preparation procedures attendant thereto. For example, as to the content of his diet, Udey testified as follows:

"Q. Now this is the affidavit that described the terms and conditions of your religious diet, is that correct?

A. These are things that would be acceptable on my religious diet. (Tr. 8, 1. 17–20).

Udey went on to state:

"I would like to let the record show that this is not my religious diet. These are things that were acceptable to my religious diet. And all I'm asking for is pure food and pure water." (Tr. 20, 1. 11–14).

(*See also:* Tr. 176, 1. 3–177, 1. 12).

As to the preparation procedures of the diet, Udey has supposedly adhered to for at least ten (10) years, petitioner's testimony was equally unclear:

"Q. So ... you would also need distilled water for washing the food? Is that correct?

A. Well, I'm trying to think about what we've done at home. Irene as a rule took care of this, but I believe that our procedure has been to rinse the food with pure water, yes.

Q. And in terms of washing, the food handlers washing before they handle the food, did you use distilled water for cleaning yourselves before you handled the food?

A. I don't think so.

Q. Why not?

A. Well, in the process of rinsing the food, I guess the hands would get rinsed too. I don't know that we made a particular point of washing hands with distilled water." (Tr. 9, 1. 11–25; *see also*: Tr. 10, 1. 1–18).

As to those food items which Udey is certain are included in his diet, there are administrative problems in the areas of

procurement, preparation and storage. Assistant Food Services Administrator Ray O. Berry, prepared a sample weekly menu for Udey based on the prisoner's affidavit of diet (Tr. 167, 1. 4–18). Berry testified that he had problems finding some of the foods (Tr. 167, 1. 21–24; 168, 1. 4–22, 170, 1. 25–172, 1. 6; 174, 1. 3–13): in order to satisfy Udey's request for organically grown lamb, it would need to be shipped from Pennsylvania. (Tr. 170, 1. 21–171, 1.6). Berry further testified that he would have to buy most of the items in bulk and expend staff time dividing the items into individual portions for storage (Tr. 169, 1. 13–16; Tr. 173, 1. 1–5); would have to feed many of these higher cost items to the main population to prevent waste (Tr. 173, 1. 20–21); that Udey's diet would require special storage facilities (Tr. 169, 1. 10–13; 1. 17–21); and that it would require approximately three (3) hours per day of additional staff time to supervise food services related to Udey's diet (Tr. 180, 1. 20–25). J. Michael Quinlan, Deputy Director of the Bureau of Prisons also testified that meeting Udey's dietary request would create additional administrative problems for the prison system (Tr. 92, 1. 4–94, 1. 20). Lawrence Charles Long, Administrator of Food Services for the Department of Justice, Bureau of Prisons in Washington, D.C., echoed the testimony of Berry and Quinlan, that providing Udey with his religious diet would create a host of administrative problems for the prison system. (Tr. 121, 1. 9–122, 1. 10).

Additionally, Udey's request for raw milk (Tr. 17, 1. 9–18, 1. 11) cannot be satisfied by the F.C.I. because the Bureau of Prisons is required by the Public Health Service to buy only pasteurized homogenized milk (Tr. 120, 1. 24–25). Prisons are obligated to provide inmates with food which complies with laws, regulations and state standards. *Ramos v. Lamm*, 520 F.Supp. 1059, 1064 (D.Colo.1981). That duty requires that an inmate's health and well being not be exposed to an immediate danger. *Ramos v. Lamm*, 639 F.2d 559, 570–572 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). The Administrator of Food Services for the Bureau of Prisons, Lawrence Long, testified that the introduction of raw milk into the prison would create a health hazard. (Tr. 121, 1. 1–8). (*See also:* Tr. 175, 1. 3–22).

The federal prison system currently houses approximately 41,400 prisoners and employs approximately 11,000 employees in its forty-seven (47) institutions (Tr. 79, 1. 12–15). Yearly, approximately $800,000.00 is spent in an attempt to accommodate approximately 1,500 inmate dietary requests. (Tr. 49, 1. 25–50, 1. 4; 85, 1. 5–9). In fact, the record reflects that prison officials made good faith attempts to determine if they could meet Udey's demands under current prison policy: Udey was first offered the option of joining the "common fare" program (Tr. 150, 1. 13–16) and then taken to the prison's food storage area to see if there were foodstuffs he would eat. (Tr. 150, 1. 9–13).

The federal prison system is to be commended for its admirable effort to accommodate prisoner First Amendment dietary claims. These efforts to meet the First Amendment rights of prisoners evidence a deep respect for our great Constitution and the fact that "religion is an important stabilizing force in the prison system" (Tr. 64, 1. 22–65, 1. 14). These accommodations, however, by necessity, must have limits. Considering the "practical necessity of managing and administering a complicated penal community" [*Alim v. Byrne, supra*, at 1045] there is an institutional need for uniform national standards. Deputy Director Quinlan explained that the need for uniformity is "critical because many times we have to transfer prisoners from institution to institution ... [a]nd for that reason, it's important that we have policies that are similar from institution to institution ...". (Tr. 78, 1. 21–79, 1. 1). The United States Supreme Court has recently held that the military is not constitutionally required to accommodate an Orthodox Jewish Rabbi's practice of wearing a yarmulke in light of the fact that such a practice would detract from the military's perceived need for uni-

formity in its dress regulations. *Goldman v. Weinberger, supra.* Should the penal system's perceived need for uniformity be accorded less weight than the military's in restricting First Amendment rights? This Court thinks not.

## SUPPLEMENTAL CONCLUSION OF LAW NO. 3

The record reflects that fulfilling Udey's request would unduly burden prison administration.

## SUPPLEMENTAL FINDING OF FACT NO. 4

### ORDER AND DISCIPLINE

Under the facts of this case, the potentially disruptive effect on prison order and discipline is perhaps the most compelling governmental interest articulated by prison officials to outbalance Udey's dietary request. *Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878; *Brown v. Johnson,* 743 F.2d 408, 410–411 (6th Cir.1984) cert. denied sub nom., *Inosencio v. Johnson,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985); *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 863 (4th Cir.1975).

All prison officials who testified mentioned their concern with the proliferation of claims for specific individual religious diets, were the system required to meet Udey's demands. The following interchange between Charles Riggs, the Chaplaincy Administrator for the Bureau of Prisons, and the Court, focuses on the problem the system would inevitably face if it were required to meet Udey's demands:

"THE COURT: ... Now, do you have any opinion, knowing what you know about this case, whether providing that service for Mr. Udey would place an undue burden on the prison system, and whether or not there is any good reason not to provide him with the food that he says would make him comply with his religious diet?

THE WITNESS: Only in as much as if we do it for Mr. Udey, we have an obligation to do it for all others who would make individual requests and that would be an undue burden for the prison system.

THE COURT: In what way?

THE WITNESS: The proliferation of those requests, the individualization. We have a number of self-initiating, self-authenticating religions which we could name, requiring specifics for their own established dietary and sacramental needs. (Tr. 73, 1. 3–18).

THE WITNESS: Based on the requests that we've had and denied in the past, I would say that it would be a very strong likelihood that others seeing that an individual could request specifically what they wanted, they also would. It's a phenomenon within the prison setting.

THE COURT: You are saying that if this were granted, that would go up, using the old phrase, go up the grapevine to the areas throughout the United States?

THE WITNESS: My experience is that that has happened and would happen. (Tr. 75, 1. 5–14).

J. Michael Quinlan, Deputy Director of the Bureau of Prisons testified that the number of inmate religious dietary requests has "grown by leaps and bounds" (Tr. 80, 1. 6) and that a policy of tailoring specific diets to the individual demands of inmates would be "totally impractical" within the federal prison system (Tr. 95, 1. 3–7). Lawrence Long, Administrator of Food Services for the Bureau of Prisons and Keith Hall, Executive Assistant to the Warden at F.C.I., Texarkana, Texas, also testified that the proliferation effect inherent in meeting Udey's demands would place an undue burden on the prison system (Tr. 122, 1. 25–123, 1. 22; Tr. 154, 1. 23–155, 1. 14).

## SUPPLEMENTAL CONCLUSION OF LAW NO. 4

The Court is of the opinion that the proliferation effect of Udey's claim, in and of itself, constitutes an undue burden on the prison system to the extent that he is not constitutionally entitled to his religious diet.

The Court does not desire to work any hardship on the Petitioner, but merely to stop what the testimony shows would be a proliferation of similar claims by other inmates. Who is to say that another individual within the system might not claim to follow a religious doctrine of some sort that would require the prison authorities to make changes in food scheduling for that person? Where does this all stop? Is it sound prison policy to allow *every* inmate claim to some religious leaning in order to receive special dietary relief? The evidence is substantial that such a program would not only be administratively unwieldly, exceedingly expensive, compromising to security, but disruptive of the prison population insofar as proper discipline is concerned. And, after all, isn't that why we have a prison system—to try and discipline individuals?

### III.

### THE FINAL BALANCE

■ In determining the final balance in favor of the governmental interests outlined above, this Court finds particular guidance in the concurring opinion of Judge Goldberg in *Brown v. Dade Christian Schools, Inc., supra* at 314–324. In the *Brown Case*, Judge Goldberg held that a school's policy of racial segregation adopted in the exercise of religion, was outweighed by the undergirding principles of the thirteenth amendment. Defendant Dade Christian sought to minimize the governmental interests at stake "as that in the admission of two blacks to the Dade Christian School, rather than as a threat in eradicating the badges of slavery" [*Brown v. Dade Christian Schools, Inc., supra* at 323], much as Edwin Udey seeks to minimize the governmental interests at stake to the burden on the system with providing him, individually, the diet he requests, rather that the burden of the proliferation effect on the prison system. Justice Goldberg, however, astutely pointed out the dangers in defining an important governmental interest too narrowly:

"This issue of the appropriate scope of the governmental interest recurs in free exercise decisions and poses important and subtle difficulties.

I believe that among the most important factors in this respect are the institutional consequences of the alternative decisions. When a court can recognize a free exercise claim without inviting numerous additional claims, focusing on the particular consequences of the ruling in the case at bar is appropriate. *But when recognizing the claim will predictably give rise to further claims, many of which will undoubtedly be fraudulent or exaggerated, the situation is different.* In that event the court must either recognize many such claims (so that the relevant governmental interest extends beyond the individual claimants in the original action) or draw fine and searching distinctions among various free exercise claimants. The latter course would raise serious constitutional questions with respect to the proper functioning of courts in sensitive religion clause adjudication. Courts are of course competent to sort sincere from insincere religious contentions, but *the process of* doing so, and of *striking different balances when confronted with sincere claims posing subtle variations in religious dogma, inevitably embroils courts undesirably in religious controversies. When numerous claims are likely, recognizing some while rejecting other unavoidably forces courts to pick and choose among religions and to draw subtle distinctions on the basis of criteria with which no governmental unit should ever become entangled.* Although the establishment clause values contravened by such a course of adjudication could not justify refusing to consider a free exercise defense, (citation omitted), *courts ought not to invite the prospect unnecessarily.* (emphasis added). (*Brown v. Dade Christian Schools, Inc., supra* at 323).

Since the claim of Petitioner for a self-styled diet would invariably invite numerous additional claims, due to the nature of

the prison environment, Udey's claims cannot be viewed in isolation. This Court is in full agreement with Judge Goldberg's position that "we should reject this opportunity to set ourselves up as a board of religious arbiters". *Brown v. Dade Christian Schools, Inc., supra* at 374.

When the governmental interest is so strong as compared to the impact on an individual prisoner's free exercise claim, it is this Court's humble opinion that the governmental interests must prevail.