**Fidel RAMOS, et al., Plaintiffs,**

v.

**Richard D. LAMM, et al., Defendants.**

**Civ. A. No. 77–K–1093.**

United States District Court,
D. Colorado.

Aug. 26, 1981.

James E. Hartley, Denver, Colo., for plaintiffs.

Tarquin J. Bromley, Asst. Atty. Gen., Denver, Colo., for defendants.

## ORDER

KANE, District Judge.

After a five week trial during October and November, 1979, I ruled that

The conditions of confinement at the Canon Correctional Facility meet all tests [of unconstitutionality] by all known measures of proof. As shown by substantial evidence, these conditions shock the conscience, are incompatible with evolving standards of decency, involve unnecessary and wanton infliction of pain, and evidence both deliberate indifference to the prisoner's protected interests and 'circumstances and conduct so grossly incompetent, inadequate or excessive as ... to be intolerable to basic fairness.'

*Ramos v. Lamm*, 485 F.Supp. 122, 154 n.20 (D.Colo.1979). With respect to specific conditions of confinement, I found that (1) the physical facilities are grossly inadequate and constitutionally impermissible [*id.* at 155]; (2) the lack of safety at Old Max deprives prisoners of one right and prevents the fulfillment of others [*id.* at 156]; (3) "the overall effect is to create conditions of idleness and lockdown that make degeneration likely and self-improvement impossible" [*id.* at 156]; (4) the failure of the state to provide adequate medical care "is a matter of such large scale as to evidence deliberate indifference to serious health needs" [*id.* at 158]; (5) "the classification system is presently unconstitutional" [*id.* at 161]; and (6) certain limitations on visitation, correspondence and access to the courts are unconstitutional. *Id.* at 162, 166.

In sum, I concluded that it "is established by clear and convincing evidence that members of plaintiff class have suffered denials of due process and the infliction of cruel and unusual punishment as the result of some of defendants' practices and procedures and many of defendants' omissions." *Id.* at 169. Accordingly, I ordered that Old Max "shall be closed," and I directed defendants to present a detailed plan by which the plaintiff class would be forever protected from further violations of their constitutional rights. I ordered that the defendants' plan must be designed to further the principals of productive activity, motility, health, integrity and safety, and coherence.

My decision was appealed by defendants to the Court of Appeals for the Tenth Circuit. The court of appeals affirmed my conclusion that the plaintiffs' Eighth Amendment rights had been violated "in the areas of shelter, sanitation, food, safety, and medical care," and that plaintiffs' constitutional rights of access to the courts had been violated as well. *Ramos v. Lamm*, 639

F.2d 559, 586 (10th Cir. 1980). In addition, the court of appeals sustained the ruling holding invalid certain restrictions on inmate correspondence, but overturned my holding that certain visitation regulations were unconstitutional. *Id.* The court of appeals vacated "the provisions of the district court's remedial order on motility, classification and idleness." *Id.* Specifically, the court of appeals concluded that "the present record and the findings on the subjects do not warrant the court's broad remedial orders" and did not establish an independent violation of the Eighth Amendment. *Id.* at 567.

Finally, the court of appeals recognized that certain new correctional facilities were under construction and that "the case should be remanded for the district court to reconsider the proper remedy in light of the present state of conditions." *Id.* at 586. I was directed to conduct "any necessary further proceedings for the development of the facts on the status of these "matters and on actions required to eradicate the constitutional violations found" and upheld by the court of appeals. *Id.* Accordingly, with the exception of those portions of my order dealing with health care, the remedial order was vacated.

On April 6, 1980, the United States Supreme Court denied cross-petitions for certiorari filed by plaintiffs and defendants. *Ramos v. Lamm*, —— U.S. ——, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). From August 17 through August 21, 1981 I conducted a hearing in accordance with the mandate of the court of appeals. This order constitutes my reconsideration of the proper remedy. Before commencing the reconsideration as ordered, I deem it necessary to articulate the precise order and then describe the present conditions in the light of that order. The order stated:

> ORDERED that Old Max shall be closed. It will no longer be used to confine inmates either temporarily, permanently or on a standby basis. Defendants herein are forever enjoined from confining members of the plaintiff class in the Canon Correctional Facility.

Since the order was issued, the name of the institution has been changed. Nevertheless, it is important to observe that Cellhouses 1 and 7 have been closed. Upon reconsideration I reaffirm this order of closure. These facilities remain unfit for occupancy and no evidence has been adduced which would justify a change in that portion of the order. The parties represent that Cellhouse 3 has been changed from a maximum security unit to a housing facility for medium or minimum security prisoners. Inmates are no longer confined to their cells there in excess of 23 hours a day as they once were. Even so, the present condition of Cellhouse 3 makes it unfit for continued habitation. The parties have represented that plans are underway to remodel it so that it will meet or exceed minimum health and sanitation standards. Because of the change in use of that facility, I do not deem its continued temporary occupancy for minimum or medium security prisoners to constitute an emergency and thus will defer ruling on its further utilization until such time as the parties notify me of their agreement to its remodeling or, absent such agreement, the plaintiffs request a further order. This temporary authorization should not be misconstrued by the parties. I have found and continue to find that Cellhouse 3 may not be used to house maximum security prisoners. Most of the changes which will be required to make Cellhouse 3 fit are included in the stipulations reached by the parties and filed with me at the beginning of these hearings for reconsideration.

I have considered the stipulations of the parties which follow and I hereby approve them and make them an order of court:

■ 1. No prisoner shall be confined in a cell which provides him individually less than 60 square feet of living space, except for inmates confined to the Diagnostic Unit and provided that individual inmates housed in the Diagnostic Unit shall not be confined therein for more than six weeks.

2. Cellhouse formerly denominated Cellhouse 1 and Cellhouse 7 at Old Max are closed and shall remain closed.

3. Lighting shall be provided in each cell at a level of approximately 30-foot candles for reading, writing and other activities; in no event, however, shall such lighting level drop below 25-foot candles. Lighting in other activity areas shall provide sufficient illumination to allow the inmates in the housing units to be able to perform the routines designed for those individual housing units.

4. Every living area which houses members of the plaintiff class shall be ventilated (or will be upon completion of the Colorado Territorial Correctional Facility/Cellhouse 3 repairs) at a level of at least 10 cubic feet of fresh or purified air per minute per person.

5. No later than October 1, 1981, a qualified architect or engineer shall evaluate the noise levels at Centennial Correctional Facility, Shadow Mountain Correctional Facility and Colorado Territorial Correctional Facility and recommend measures for reducing the noise levels in those institutions. Thereafter, defendants shall reduce such noise levels by implementing any reasonable measures recommended by the architect or engineer. An attempt will be made to reduce sound levels within the residential areas in which class members live to a level not to exceed 60 dB(A) during the day and 55 dB(A) at night.

6. All inmates shall have (or will have upon completion of the Colorado Territorial Correctional Facility/Cellhouse 3 repairs) hot and cold water available to them in their cells or living areas and shall be provided with the opportunity to shower at least 6 times per week. All toilets, lavatories, and showers shall be maintained in an operable condition and there shall be no cross-connections between the waste water system and the potable water supply.

7. Defendants shall designate specific Department of Corrections employees who, under the supervision of the Director of the Division of Adult Services or the Department of Corrections Inspector General, shall have the responsibility to insure maintenance of minimal health and sanita-tion standards at each institution in which class members are housed. This person shall have the responsibility for monitoring compliance with a written routine of daily housekeeping designed to insure that a minimal level of cleanliness is maintained at the institution, and that the presence of cockroaches, rodents, and other vectors of disease is minimized. This routine shall, at a minimum, provide the following:

(a) A schedule shall be set forth listing in reasonable detail the areas to be cleaned, and the procedure for cleaning each area, including the frequency of cleaning, the specific person or persons assigned to clean each area and the procedure for procurement and maintenance of housekeeping equipment and supplies.

(b) Cleaning activities shall be supervised at all times by designated civilian staff.

(c) A checklist shall be devised for a daily inspection of all areas by a designated employee to insure that all areas are clean and sanitary. The employee shall certify in writing that he or she conducted the inspection.

(d) Where applicable, screens shall be maintained on windows and doors.

(e) Window panes shall be continually maintained in all areas.

(f) Structural defects, if any, which allow rodents to enter the buildings shall be cured.

(g) An effective vermin and pest control program shall be implemented.

(h) Access to household cleaning supplies is now and shall continue to be provided to inmates to maintain personal living areas in a sanitary fashion.

(i) Unsanitary mattresses and blankets shall be made sanitary or replaced. Replacement mattresses shall be obtained which are manufactured from materials which are fire retardant, moisture resistant, and easily cleanable. The designated employee(s) described in paragraph 7 above shall be responsible for insuring the continued sanitation of mattresses and other bed linens, and in no case should a mattress

used by one inmate be used by another inmate without first being sanitized.

(j) Buildings, including roofs, ceilings, walls and floors shall be maintained in good repair.

■ 8. By April 1, 1982, a comprehensive written preventive maintenance manual shall be prepared which includes an inventory of all equipment and systems along with a schedule for regular inspection and maintenance of said equipment and systems which meet the maintenance requirements of the manufacturer's specifications. The manual shall list the employees responsible for executing the plan and specific measures to be taken in maintaining each machine or system. Those persons shall be adequately trained for said duties. A checklist shall be developed and implemented for inspection and maintenance of each machine or system, and the person responsible for inspection and maintenance shall certify that the facts stated on the checklist are true.

■ 9. Any and all facilities which house class members shall meet applicable fire safety and prevention standards including those provided by the applicable version of the Life Safety Code of the National Fire Protection Association or the equivalencies provided for therein.

(a) Defendants shall have the appropriate State and local fire officials inspect the facilities and procedures utilized for fire safety quarterly and consistent with the results of the inspections and the recommendations made by said officials, adequately provide for the safety of the inmates in case of fire. The facilities and procedures shall provide for the following:

(i) Specific provisions for adequate fire protection service.

(ii) Specific equipment such as fire extinguishers and fire hoses to be located at specific appropriate places within the institution and an inspection and preventive maintenance schedule for said equipment.

(iii) The specific responsibilities of staff and inmates in the event of a fire.

(iv) The required training drills to be given staff and inmates in fire safety.

(b) By September 1, 1981, the Department of Corrections shall submit its facilities and fire safety procedures to the appropriate State and local safety officers for inspection to insure compliance by each institution in which class members are housed with applicable fire safety and prevention standards, including those provided by the applicable version of the Life Safety Code of the National Fire Protection Association.

(c) Regular fire drills involving all inmates and staff shall be conducted at least once quarterly. In the event that such fire drills cannot be safely conducted, alternate methods may be taken to insure that the occupants can be expeditiously removed from the living units in case of fire. Any such alternate methods must be approved by the appropriate local fire safety official or some other qualified fire safety expert.

(d) Facilities operated by the Department of Corrections shall meet all applicable building and electrical codes.

■ 10. All indigent prisoners shall be provided with soap, toothpaste, toothbrush, shaving materials and other personal hygiene items without charge.

■ 11. Those class members who are not permitted to wear personal clothing shall be provided with an adequate supply of prison-issue clothing, including underclothing and socks. Defendants shall provide adequate equipment and services for laundering all clothing, whether prison-issue or personal.

■ 12. Defendants shall maintain a procedure for maintaining a record of inmate property and shall continue to provide personal footlockers or other secure storage.

■ 13. Defendants shall provide to class members three wholesome and nutritious meals per day, prepared and served consistent with the laws, regulations and standards of the State of .Colorado.

■ 14. The parties recognize that all food service operations used for the preparation of food served to prisoners housed at

CCF, SMCF and CTCF must meet all Colorado Department of Health Regulations Regarding Food Service Establishments and Regarding Sanitary Standards and Regulations for Penal Institutions. To enable defendants to obtain necessary funding to accomplish this requirement, defendants shall have until August 1, 1982, to seek such funding through the normal legislative process and complete the necessary renovation in order to comply with applicable health regulations and standards.

■ 15. All staff employed at institutions where class members are housed shall be provided with adequate pre-service and inservice training.

■ 16. Defendants shall provide adequate medical care to members of the plaintiff class.

From the testimony and exhibits which were introduced during the reconsideration hearing I find that exceptional and dramatic progress has been made by the defendants to "eradicate the constitutional violations found." The testimony of the prison officials shows a basic attitudinal change which leads me to the optimistic belief that I can begin a process of extricating the federal court from exercising its remedial powers in this action, but I hasten to add that such a point is an objective which is yet to be reached. I do not find that the constitutional violations found have been eradicated. I find that while conditions have improved, staff shortages and assignments combined with a lack of certain material items contribute to a denial of the members of the plaintiff class to a reasonably safe and secure environment. In this regard I am ever mindful of the safety and security of the prison staff as well. The two are interrelated. It is not possible for an inadequate staff to utilize the design capabilities of the new institution. The tendency without adding staff is to engage in a "lockdown" operational mode which only increases the danger to inmates of further violence, unnecessary stress and debilitating inactivity.

In a similar vein, I find that the change in providing mental health care has been positive and dramatic. Nevertheless, there is ample evidence to show that immediate treatment of emergency cases is inadequate. Further, present arrangements for the provision of long-term care when required is neither certain nor established. Physical facilities necessary to conduct interviews, treatment sessions and consultations are inadequate. The evidence is in conflict concerning the number of staff additions which are necessary, as distinguished from desirable, to bring the delivery of mental health services to an acceptable standard. Nevertheless, the evidence is clear that staffing is inadequate to provide required services at night and to maintain adequate records. A few questions such as the provision of psychiatric nursing services are in a gray area where it is not presently possible to tell whether the inadequacy amounts to a constitutional deprivation or is simply a manifestation of policy. Such a difference is, of course, critical since my responsibility is to insure only that constitutional minima are met.

In no area is this distinction between policy and constitutional mandate more obvious than in that of access to the courts. The defendants are embarking on a number of paths to insure that this right of members of the plaintiff class is respected. The evidence shows that the defendants are proceeding in good faith to provide adequate law libraries, but there is virtually no showing at all that adequate assistance is provided. The evidence shows that one inmate assistant is trained and skilled in providing legal assistance. Another is self-taught and tries his very best, but there is no system for training legal assistants to replace the present inmate-advisors upon their release. Further, while regulations have been issued which are designed to prohibit profiteering and other forms of victimization of those in need of legal assistance, there is no system for enforcing the regulations and there is no staff member trained to administer such a system even if instituted. The evidence shows as well that necessary supplies such as forms, paper, and reproduction equip-

ment are scarce and unevenly distributed. The hours in which law library services are available and the space provided for the libraries, staff and work areas are also inadequate.

The question of access has been addressed by me in greater detail in a pending case concerning the Buena Vista Correctional Facility. (*See Boulies v. Ricketts,* 518 F.Supp. 687 (D.Colo.1981)). Additional elaboration of the more intelligent and less expensive options available to the defendants to insure this fundamental right would serve no useful purpose. If defendants choose to employ the law library-legal assistance method, the current state of the law binds me to accept the choice. At the present time, however, the right is being denied in virtually every respect. The testimony shows that defendants are making efforts to correct this denial and therefore I will defer imposing any specific directions at this time.

The plaintiffs have requested that I issue particular orders and appoint a special master to oversee the implementation of those orders. I decline to take that step at this time. I believe such a step is unnecessarily intrusive. The defendants have shown that they are capable of making considerable changes in the direction of the eradication of the constitutional violations found. My original order suggested to the defendants that closure could be avoided by taking immediate and continuing steps to cease and desist from maintaining conditions which violate state and federal law. I am well aware that such steps take time and further that as with any new facility or system it takes time and the ability to adjust from preconceived plans to presented reality before such conditions can be permanently changed. Perhaps more importantly, I am aware that such changes must be based on a change in attitude. I cannot order such attitudinal change and I believe that the more latitude which is afforded to the defendants at this juncture in the litigation the greater will be the chance that such change will occur.

Conversely, it would be irresponsible for me to cease the exercise of jurisdiction until the constitutional violations are eradicated. The order of closure has been observed in large measure. Sanctions can be imposed against the defendants if such prove to be necessary.

Accordingly, I adhere to my original order in the following respect: In addition to the ORDERS set out in the text above, the defendants are

ORDERED to present a detailed plan and timetable which sets forth the means by which the present conditions will be changed so that members of the plaintiff class will be forever protected from further violations of their Eighth and Fourteenth Amendment rights. This plan, which must include specific completion dates for each proposal, shall be filed with the court and served upon plaintiffs' counsel on or before December 15, 1981. Upon receipt of the plan, as ordered, the case will be set for status conference so that the remedial stage of this case may proceed toward a final order. In the meantime, the court will begin to resolve the individual damage claims which were previously abated.