STATE of Colorado, for the Use of the
DEPARTMENT OF CORRECTIONS,
Petitioner/Cross–Respondent,

v.

Federico PENA, Mayor of the City and County of Denver; J.D. MacFarlane, Manager of Safety, City and County of Denver; John Simonet, Director of Corrections for the City and County of Denver; Mose Trujillo, Warden of the Jail for the City and County of Denver; and Sal Carpio, Robert Crider, Kathy Donohue, Stephanie Foote, Ted Hackworth, Nieves McIntire, Kathy Reynolds, William Roberts, William Scheitler, John Silchia, and Paul Swalm, City Council Members, City and County of Denver, Respondents/Cross Petitioners.

No. 94SC227.

Supreme Court of Colorado,
En Banc.

Feb. 20, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Paul Farley, Deputy Attorney General, John August Lizza, First Assistant Attorney General, Paul S. Sanzo, Senior Assistant Attorney General, Human Resources Section, Denver, for Petitioner/Cross Respondent.

Daniel E. Muse, City Attorney, Stan M. Sharoff, Assistant City Attorney, Denver, for Respondents/Cross Petitioners.

Bruno, Bruno & Colin, P.C., Marc F. Colin, Richard A. Stubbs, Denver, for Amici Curiae Board of County Commissioners and County Sheriffs of the following counties: Adams, Alamosa, Arapahoe, Baca, Boulder, Clear Creek, Delta, Douglas, El Paso, Fremont, Gilpin, Grand, Gunnison, Jackson, La Plata, Lincoln, Montrose, Morgan, Prowers, Pueblo, Rio Blanco, Rio Grande, Routt, Saguache, Summit, and Yuma.

Justice SCOTT delivered the Opinion of the Court.

This case is one of several litigated by the Department of Corrections (DOC) and the

City and County of Denver regarding the transfer of state-sentenced prisoners from county jails to state prisons. The litigation has focused upon overcrowded conditions in the Denver County Jail due in part to a backlogging of state-sentenced prisoners in that facility. We granted certiorari to determine whether the court of appeals erred when it (1) held that a district court may order the DOC to take state-sentenced prisoners in a particular order; and (2) vacated that portion of the Denver District Court's order which directed the DOC to ignore an Arapahoe County District Court order.[1]

The State of Colorado (State) filed its petition for certiorari seeking our review of the court of appeals' judgment in *State ex rel. Dep't of Corrections v. Pena*, No. 93CA0820 (Colo.App.1994) (not selected for publication). The court of appeals held that the DOC's practice of backlogging state-sentenced prisoners at the Denver County Jail violated a 1987 permanent injunction issued by the Denver District Court (Denver Order) requiring it to remove state-sentenced prisoners within seventy-two hours. Federico Pena, Mayor of the City and County of Denver; J.D. MacFarlane, Manager of Safety for the City and County of Denver; John Simonet, Director of Corrections for the City and County of Denver; Mose Trujillo, Warden of the Jail for the City and County of Denver; and several City Council Members for the City and County of Denver (Denver) filed a cross petition seeking review of that portion of the court of appeals' judgment holding that the Denver District Court did not have the authority to direct the DOC to disregard an Arapahoe County District Court order. As set forth below, we affirm.

I

A. The 1987 Denver Order

In 1986, because of overcrowding in

1. Our order granting certiorari set forth the following issues to be addressed by the parties: Whether the court of appeals erred in concluding that a district court may order the Department of Corrections to take state prisoners in a particular order.

Whether the court of appeals erred in vacating a portion of the Denver District Court's order which directed the Department of Corrections to ignore an Arapahoe County District Court order.

the Denver County Jail,[2] the City and County of Denver refused to accept a parolee arrested in Denver for "technical" violations of parole.[3] On May 2, 1986, the DOC brought an action to compel Denver to accept accused parole violators pending revocation proceedings. Denver counterclaimed, requesting reimbursement under the prison reimbursement statute, section 17–1–112(1), 8A C.R.S. (1986),[4] for each state-sentenced prisoner housed in the Denver County Jail.

On September 28, 1987, the Denver District Court entered a permanent injunction requiring the DOC to remove all state-sentenced prisoners from the Denver County Jail within seventy-two hours and prohibiting the DOC from backlogging state-sentenced prisoners at that facility.[5] In addition, the trial court held that the Denver County Jail, given the conditions of extreme overcrowding, was under no obligation to accept technical parole violators tendered to it by state authorities. Finally, pursuant to section 17–1–112, the trial court ruled that the DOC owed Denver $835,000 for housing state sentenced prisoners.

DOC appealed the latter two rulings by the trial court.[6] However, DOC did not seek review of the injunction requiring it to immediately remove state-sentenced prisoners from the Denver County Jail. The Denver Order, which was not appealed, thus became a final judgment.

### B. The 1991 Arapahoe County District Court Order

In connection with a separate criminal proceeding, the Arapahoe County District Court was confronted by the consequences of the DOC's backlogging practices when DOC did not take immediate custody of the defendant remanded to its custody in *People v. Christy*, No. 89CR77 (Arapahoe County Dist. Ct. Apr. 2, 1991) (Arapahoe Order).[7] Noting a "statewide backlog" regarding the transfer of state-sentenced prisoners from county to state facilities, the Arapahoe trial court entered its order on April 2, 1991. The DOC did not seek review of the Arapahoe Order, which by operation of law became final. Pursuant to the Arapahoe Order, the court ordered the DOC to (1) "place all inmates throughout the state awaiting transfer to DOC on a statewide backlog list in order of their sentencing date"; (2) transfer county inmates to state facilities "on a 'first on list

2. On May 1, 1986, the Denver County Jail, designed to accommodate safely 550 to 600 inmates, was holding 1,017 prisoners. After a hearing, the district court found that overcrowding at the Denver County Jail had created a dangerous and explosive atmosphere.

3. A technical parole violator is a person not charged with any new criminal activity, but who has violated certain conditions of his or her parole, such as failing to report to the parolee's parole officer or failing to report a change of address.

4. At times relevant thereto, § 17–1–112(1) provided that, subject to appropriations, the state shall reimburse any county or city and county, in an amount of sixteen dollars per day to maintain a prisoner in a jail of the county or city and county, for the expenses ... of any person who is sentenced to a term of imprisonment in a [state] correctional facility and who is confined in a local jail.
As later amended, the amount of per day compensation has been increased to forty dollars. § 17–1–122(1), 8A C.R.S. (1995 Supp.). In *State ex rel. Dep't of Corrections v. Pena*, 855 P.2d 805 (Colo.1993), we applied that statute to Denver's claims for reimbursement for housing state-sentenced prisoners.

5. Backlogging occurs when the DOC fails to take state-sentenced prisoners housed in a county jail and remanded to its custody. By delaying its acceptance of prisoners, the DOC reduces the number of inmates it must house. While beneficial to the DOC, the practice causes county jails to retain custody of persons properly the responsibility of the DOC, resulting in overcrowding in some county facilities.

6. The two rulings respecting Denver's refusal to accept parole violators and its claims under the prison reimbursement statute were affirmed by the court of appeals in *State ex rel. Dep't of Corrections v. Pena*, 837 P.2d 210, 212 (Colo.App. 1992). We affirmed the court of appeals' judgment in *State ex rel. Dep't of Corrections v. Pena*, 855 P.2d 805 (Colo.1993).

7. *People v. Christy* was a proceeding under the Colorado Criminal Code in which defendant Christy was convicted and sentenced for incarceration to the custody of the DOC. The DOC was not a party to the proceeding, however, because it failed to timely assume custody of Christy. The trial court ordered the DOC to take affirmative action with respect to state-sentenced prisoners generally.

first out basis' "; (3) assign inmates "a priority number according to his/her sentencing or revocation date" so that "inmates with the oldest sentencing or revocation date shall be given the lowest number"; (4) receive inmates "based upon such number, beginning with the lowest number and continuing in numerical progression (except for emergency situations ... )"; and (5) provide the trial court with a state-wide backlog list in the event there is a backlog. In addition, the Arapahoe Order stated that the DOC was subject to the order until informed otherwise by the court.

### C. Enforcement of the Denver Order

In light of the Arapahoe Order, the DOC sought to modify the Denver Order by filing a motion for relief from the order with the Denver District Court. In response, Denver filed a motion to enforce the Denver Order. On May 3, 1991, after a hearing, the Denver District Court denied the DOC's request to modify the Denver Order:

> This matter comes before the court pursuant to two motions, one filed by ... [DOC] and [Denver]. [DOC] seeks by its motion to modify the injunction previously issued by this court in 1987. [Denver's] motion seeks to enforce the injunction. The triggering mechanism for the filing of both motions is an order entered April 2, 1991 by the Honorable Richard D. Turelli in the case of *People vs. Christy, etal.,* [sic] 89CR77 in the District Court for Arapahoe County. This court's order from 1987 and Judge Turelli's order when read together place the [DOC] on the horns of a dilemma. The dilemma, simply stated, is if the [DOC] follows either order it stands potentially to be in violation of the other order....

> This Court's order of October 2, 1987, nunc pro tunc to September 28, 1987 was a limited order relating only to the Denver County Jail. The ruling in *People vs. Christy,* supra, purports to set up a comprehensive statewide prioritization of the backlogged state[-sentenced] prisoners....

>     ....

> In his argument, which the Court believes was well reasoned and thoughtful, Mr. Sanzo on behalf of [DOC] urged that what was needed was a statewide comprehensive solution to the problem because the problem is statewide. His argument suggested that with the 13 orders which have been issued to the [DOC] in a piecemeal fashion, that the dilemma now faced by the [DOC] was almost inevitable.

> Mr. Sharoff, in his argument for [Denver] noted that perhaps the only two detention facilities in the state that are overcrowded were before the court. The statistics from [Denver's] Exhibit D seem to bear out this view. I am not certain this is absolutely true for I do not have statistics from each county jail of the state. The court remains satisfied, however, that ongoing overcrowding in these two facilities has once again compelled good people on both sides who are genuinely working towards a resolution of their mutual problems to be opponents in court.

> The narrow issue before this court is whether the court will continue to enforce its injunction of 1987 or whether it will modify the injunction pursuant to the request of the [DOC].... The situation in the Denver County Jail remains, even with the recent construction, that there are approximately 300 more prisoners in that facility on a daily basis than the rated capacity of that jail. While all the other county jails may have state[-sentenced] prisoners who are backlogged, none of those county jails have reached even their rated capacity, let alone a number greater than their rated capacity. The court concludes that these figures show that only Denver is in an extreme and dangerous situation based upon its prisoner inmate population versus rated capacity. This factor is paramount in the court's decision.

> The Motion to Modify the Court's previous order of 1987 is Denied. The Motion to Enforce the 1987 Injunctive Order is Granted....

> The court knows that by entering this order the [DOC] remains on the horns of the dilemma that forced it to bring the

Motion to Modify. With this ruling perhaps the matter is now ripened and properly framed for a review by a body with statewide jurisdiction.

On April 17, 1992, Denver filed a verified motion for contempt citation, seeking an order from the Denver District Court finding Frank Gunter, then Executive Director of the DOC, and Ben Griego, an administrative officer of the DOC, "in contempt of the court's orders and [awarding] damages for . . . [DOC's] contumacious conduct" in failing to comply with the 1987 Denver Order. On May 13, 1993, pursuant to C.R.C.P. 107, the trial court found Gunter to be in contempt of court for failing to take custody of state-sentenced prisoners within seventy-two hours pursuant to the 1987 Denver Order.[8] In reviewing the contempt citation, the court ordered *inter alia* that (1) the Executive Director shall follow the court's 1987 and 1991 rulings; (2) the DOC shall take first, all prisoners subject to federal court orders and, second, all prisoners from Denver County Jail until the Denver County Jail backlog has been reduced to zero; (3) the Executive Director shall not follow the dictates of the Arapahoe Order; and (4) the DOC shall pay to the Denver County Jail forty-three dollars per day per prisoner for all state-sentenced prisoners that are held in the Denver County Jail.

On appeal, the court of appeals upheld the trial court's order that the DOC take state-sentenced prisoners in a particular order, despite the State's contention that the order violated the separation of powers doctrine. *See State ex rel. Dep't of Corrections v. Pena*, No. 93CA0820 (Colo.App.1994) (not selected for publication). The court of appeals found that the trial court's ruling "reflects that court's effort to fashion a remedy to enforce the injunction entered in 1987 for the purpose of protecting both the lives of the prisoners and prison employees." *Id.* at 3. Moreover, the court of appeals did not agree with the State that the priority in which the DOC will take prisoners is a decision vested solely in the Executive Director's discretion,

concluding that any contrary holding would result in an obstruction of Denver's "efforts to protect human lives." The court of appeals did hold, however, that the trial court "lacked the power to direct the DOC to disregard the order entered by the Arapahoe District Court," *id.* at 4, a court of concurrent jurisdiction and vacated that portion of the trial court's ruling.

We granted certiorari to review the court of appeals' decision in *State ex rel. Dep't of Corrections v. Pena*, No. 93CA0820 (Colo. App.1994) (not selected for publication). Because we find that the Denver District Court had the authority to enforce its order directing the DOC to take state-sentenced prisoners under the circumstances and conditions existing in the Denver County Jail, and because we agree that the trial court did not have the authority to direct the DOC to ignore the Arapahoe Order, we affirm.

## II

It is beyond dispute that, at the time this matter was before the court, the overcrowded situation at the Denver County Jail constituted an emergency. In 1992, Judge Jeffrey Bayless for the Denver District Court stated "the emergency is worse now than it has ever been in my four and one half year history with this case." In 1987, the capacity of the Denver County Jail was 650 prisoners, but it held 1,240 prisoners. In 1991, although its capacity increased to 950 prisoners, the Denver County Jail held 1,241 prisoners. By 1992, the Denver County Jail population exceeded its rated capacity by more than 500 prisoners, a factor of fifty percent or more over its rated capacity. The trial court found that Denver County Jail prisoners were bunked everywhere, including spaces not designed as inmate living quarters. Day rooms, formerly places where prisoners could get away from sleeping areas, no longer existed; they were filled with double bunks. Furthermore, office space designed for administrative purposes housed prisoners. Stated simply, because the legislature or City

---

8. The motion for a similar order against DOC administrator Griego was denied. The court's order also noted that the parties had agreed on

the amount of damages the court ordered DOC to pay Denver and "that such payment has been made."

Council did not provide more, the Denver County Jail was out of space.

The record shows and the trial court held that overcrowding causes increased danger of violence, including inmate riots. At trial, John Simonet, Denver's Director of Corrections, verified the substantial increase in violence corresponding to overpopulation. The overcrowding condition at the Denver County Jail severely affected the living conditions of the inmates. Simonet noted that the American Correctional Association standards specify one toilet, one sink, and one urinal for every eight to eleven inmates. Conditions at the Denver County Jail provided only four to five toilets and sinks for each group of sixty to seventy prisoners. The record indicates that overcrowding generally has adverse effects on all aspects of living for the jail population from eating to the delivery of medical services.

In 1992, the trial court found the overcrowded conditions of the Denver County Jail were worse than those existing within the DOC. Furthermore, the trial court found that other county jails in the Denver metropolitan area were not overcrowded, and

none were filled to their maximum rated capacity.

■ However, the record also indicates that little evidence, if any, was presented regarding the actual conditions of other county jails. The Denver District Court, in its fourth and sixth findings of fact, found "as of February of this year, 1992, the backlog has once again begun, I think, statewide" with "90 in the Denver County Jail and 270 or thereabouts statewide...." Finally, the trial court noted that neither the DOC nor Denver was a party to the Arapahoe County proceedings.[9]

We are not aware of the relevant statistics for 1995 regarding the conditions of the Denver County Jail, nor can we find in the record sufficient evidence regarding the condition of other county facilities. However, in light of the record before us, we assume that the urgency for correcting the problem remains. The trial court found that both parties were making good faith efforts to resolve the overcrowding dilemma, despite their respective budgetary problems and increased populations resulting from more convictions and longer sentences. However, it is undisputed that the overcrowding problem at the

9. Although not applicable under the procedural history of the case before us, our rules of civil procedure provide for the consolidation of cases under appropriate circumstances. C.R.C.P. 121, § 1–9 states that "[c]onsolidation of matters pending in other districts shall be determined in accordance with C.R.C.P. 42.1." C.R.C.P. 42.1 provides a procedural framework for "Consolidated Multidistrict Litigation." The rule includes transfers and their subsequent procedures. C.R.C.P. 42.1(k)(1) states that "[u]pon receipt of an order from the Chief Justice assigning the actions to a judge, the clerk of the transferor court shall submit to the clerk of the court of the assigned judge copies of all papers contained in the original file and a certified copy of the register of actions." The ultimate "[a]uthority to transfer the actions is vested in the chief justice." *Beckord v. District Court,* 698 P.2d 1323, 1327 (Colo.1985). In *Beckord,* the court stated:

> Rule 42.1 provides that "[w]hen actions involving a common question of law or fact are pending in different judicial districts, such actions may be transferred to any judge for hearing or trial of any or all of the matters in issue in any action." C.R.C.P. 42.1(b). Transfer is appropriate if "one judge hearing all of the actions will promote the ends of justice and the

just and efficient conduct of such actions." *See* C.R.C.P. 42.1(g) (factors relevant to transfer). Under Rule 42.1, the Panel on Consolidated Multidistrict Litigation (Panel) is authorized to consider whether civil actions should be transferred. If appropriate, the Panel certifies the cases to the chief justice with its recommendation of a particular judge to hear the consolidated actions. C.R.C.P. 42.1(h). The actual transfer and consolidation is accomplished by an order from the chief justice assigning the actions to a judge. C.R.C.P. 42.1(i), (k)(1).

*Id. Beckord* constitutes the major case discussing C.R.C.P. 42.1, and it succinctly articulates the general transfer procedure. The factors relevant to transfer include:

> (1) whether the common question of fact or law is predominating and significant to the litigation; (2) the convenience of the parties, witnesses and counsel; (3) the relative development of the action and the work product of counsel; (4) the efficient utilization of judicial facilities and manpower; (5) the calendar of the courts; (6) the disadvantages of duplicative and inconsistent rulings, orders or judgments; and (7) the likelihood of settlement of the actions without further litigation should transfer be denied.

C.R.C.P. 42.1(g).

Denver County Jail occurs in large part because it continues to hold state-sentenced prisoners. Because the DOC simply cannot intake all backlogged prisoners at one time, some agency or public entity must set intake priority procedures. The solution lies in creating an acceptance system that recognizes the severity of the problem in the Denver County Jail and affords that jail, along with other county facilities, appropriate consideration as the DOC carries out its statewide responsibilities. The question raised by our grant of certiorari, however, is limited to whether a trial court has the authority to enforce its orders having the full force of a final judgment, or whether the Executive Director of the DOC has the discretion to comply with or disregard such orders.

## III

The State contends that the court of appeals erred in upholding that portion of the trial court's order that requires the DOC to take state-sentenced prisoners from the Denver County Jail before it takes state-sentenced prisoners from other county jails. In support of its position, the State asserts (1) the DOC's intake process is the sole responsibility of its Executive Director, who must have discretion over that process in order to fulfill his or her statutory duty to comply with mittimi of the various sentencing courts of the state's several judicial districts and to balance the needs and demands of the several county jails and all state-sentenced prisoners; and (2) any interference with that discretion by the judiciary constitutes a violation of the Distribution of Powers provision of the Colorado Constitution. Colo. Const. art. III.[10] Denver, on the other hand, contends that the Denver District Court did not exceed its jurisdiction by enforcing the 1987 Denver Order, a final judgment mandating the transfer of state-sentenced prisoners from the Denver County Jail to DOC within seventy-two hours, and that the Denver Order did not violate the Division of Powers doctrine. Denver

also seeks reversal of that part of the court of appeals' judgment vacating a portion of the Denver Order directing the DOC to ignore the orders of the Arapahoe County District Court and asks that we hold the Arapahoe Order void. We agree with Denver that the court of appeals should be affirmed as to its holding that the Denver District Court had the authority to enforce the 1987 Denver Order, which had become a final judgment. However, we believe the Denver court exceeded its authority when it attempted to direct the DOC to ignore an order of a coordinate district court.

### A

The DOC is a department of the Executive Branch of State Government. *See* §§ 24-1-110, -128.5, 10A C.R.S. (1988 & 1995 Supp.). The province of the Executive Branch is to see that the laws are faithfully executed. *McDonnell v. Juvenile Court,* 864 P.2d 565, 567 (Colo.1993). By statute, the DOC is commanded to assume custody of state-sentenced prisoners pursuant to mittimi issued by all district courts in the state. *See* §§ 17-40-101 to -107, 8A (1986 & 1995 Supp.). In effect, by its contempt proceedings, the Denver District Court enforced the 1987 Denver Order directing the DOC to take immediate custody of state-sentenced prisoners held in the Denver County Jail, which the DOC is statutorily mandated and has a duty to do.

The Judicial Branch of Government has the authority to assure that the DOC, an agency of the Executive Branch of Government, performs its statutorily mandated duties. DOC officials have a nondiscretionary duty to take custody of state-sentenced prisoners. *See People v. Lockhart,* 699 P.2d 1332, 1336 (Colo.1985). Where necessary, mandamus relief is available to compel the performance of a nondiscretionary ministerial duty. *Hall v. City & County of Denver,* 117 Colo. 508, 512, 190 P.2d 122, 125 (1948). The "intake" statutes, sections 17-40-101

---

10. Article III of the Colorado Constitution is the analog to the Separation of Powers Clause of Article III of the United States Constitution. Our use of the term "distribution of powers" is consistent with the language of our constitution.

Due to the common usage of the term "separation of powers," however, we will defer to common practice and usage, utilizing the two phrases interchangeably.

to –107, 8A C.R.S. (1986 & 1995 Supp.), direct the Executive Director to assume custody of felons. Likewise, the sentencing statutes, sections 16–11–301(*l*) and –308, 8A C.R.S. (1986), require the Executive Director to receive and take custody of state-sentenced prisoners.

■ We agree that, in the ordinary course, it is within the sound discretion of the Executive Director to resolve how and when to receive state-sentenced prisoners and that no statutory provision authorizes a trial court to substitute its judgment for that of the DOC administrator. *Cf. Kort v. Hufnagel,* 729 P.2d 370, 372 (Colo.1986) However, although a trial court may lack subject matter jurisdiction "to *supervise*" an executive agency, it does have the statutory authority and subject matter jurisdiction to place a defendant in the custody of the DOC. *McDonnell,* 864 P.2d at 568 (emphasis added). When a trial court remands a defendant to the custody of the DOC, it is within the sound discretion of the Executive Director as to when or where custody will be exercised. Nonetheless, the Executive Director's action or inaction in response to a mittimus transferring custody to the DOC may be reviewed by the trial court for conduct that amounts to a clear abuse of discretion. Consequently, where DOC officials fail to comply with such an order, the trial court may take appropriate steps to enforce its order. In *Lockhart,* we held:

> [C]orrections officials are officers of the court *for the limited purpose of taking custody of* prisoners as directed by the mittimus. Otherwise, the court would be without the ability to comply with section 16–11–301(*l*) and to effectuate the commencement of a prison sentence. Because the district court has jurisdiction to issue the mittimus ordering Department of Corrections officials as officers of the court to take custody of the prisoner, the court also has jurisdiction to enforce that order by a contempt proceeding.

*Lockhart,* 699 P.2d at 1336 (emphasis added); *see also People in Interest of S.C.,* 802 P.2d 1101, 1103 (Colo.App.1989) (district court had the authority to hold an executive agency in contempt for refusing to take custody of an offender), *cert. denied,* January 14, 1991.

■ Here, the Denver Order mandates that prisoners be taken in such a manner as to prohibit the DOC from backlogging state-sentenced prisoners at the Denver County Jail, which should ameliorate overcrowding. A court may interpret the sentencing statutes, compel the DOC to act in accordance with the mandates of the sentencing statutes, enforce such orders, direct the Executive Director to take all state-sentenced prisoners into his or her custody, and may impose upon the Executive Director a new duty of accepting prisoners in a particular sequence or constrain the exercise of his or her discretion as contemplated by law. *See Lockhart,* 699 P.2d at 1336.

■ The district court has jurisdiction to issue the mittimus ordering DOC officials as officers of the court to take custody of the prisoner. In the exercise of its authority, the district court issued the Denver Order, which by operation of law became a final judgment of the court. As a result, the court must also have jurisdiction to enforce that order by a contempt proceeding. A court may only punish the Executive Director, however, if he or she refuses or fails to take a state-sentenced prisoner for whom there is space available in the DOC system. *See id.* The Executive Director may not be held in contempt for refusal to do that which he or she is unable to do. *Id.* However, to the extent the DOC is able to admit more prisoners into its facilities, the district court may compel the DOC to comply with its mittimus orders and its statutory duty to accept state-sentenced prisoners.

## IV

■ Denver filed a cross-petition claiming that the court of appeals erred in vacating the portion of the Denver Order which directed the DOC to ignore the Arapahoe Order. We disagree.

The 1987 Denver Order and the 1991 Arapahoe Order, when read together, place the DOC in a dilemma. The dilemma, simply stated, is if the DOC follows either order it stands potentially to be in violation of the

other order.[11] In April 1991, the Arapahoe County District Court, believing that the Denver Order caused the DOC to establish a priority system that was imposing a "disproportionate burden" on certain unidentified counties and criminal defendants, issued its own order setting forth a priority system based on DOC taking prisoners by order of sentencing, with some exceptions. In April 1992, the Denver District Court was called upon to enforce the 1987 Denver Order. Because the Arapahoe Order became effective almost four years after and conflicted with the Denver Order, the Denver District Court ordered the DOC to ignore the Arapahoe Order.

With respect to situations where courts of co-equal jurisdiction issue conflicting orders, "the court first acquiring jurisdiction of the parties and the subject matter has exclusive jurisdiction." *Public Serv. Co. v. Miller*, 135 Colo. 575, 577, 313 P.2d 998, 999 (1957). Accordingly, Denver concludes that if there was any usurpation of jurisdiction, it was by the order of the Arapahoe County District Court in *Christy* rather than by the Denver District Court because the Denver District Court first acquired jurisdiction of the parties and the subject matter.[12] According to Denver, "[n]otwithstanding the existence of the Denver order, the Arapahoe County District Court entered an order which either conflicted with, changed or negated all or parts of the Denver order." Thus, Denver submits the trial court did not exceed its jurisdiction in enjoining the DOC from following the Arapahoe Order because that order was in direct conflict with the already existing Denver Order.[13]

Denver fails to recognize that a district court is without supervisory power over courts of coordinate jurisdiction; all district courts are equal in the judicial hierarchy. The jurisdiction of the trial court does not extend to a review of the decisions and judgment of a court of coordinate jurisdiction. *Hill v. Benevolent League of Colo. Travelers Ass'n*, 133 Colo. 349, 350, 295 P.2d 231, 232 (1956); *Pipkin v. Brittain*, 713 P.2d 1358, 1360 (Colo.App.1985). As stated by the court in *Hart v. Best*, 119 Colo. 569, 580–81, 205 P.2d 787, 793 (1949):

> Here we are presented with a situation where the district court of Fremont county and that court in Prowers county are courts of equal authority and dignity; they are coordinate; neither has the power or authority to consider the validity or set aside the judicial acts of the other. Neither has, as related to the other, appellate jurisdiction; that jurisdiction is vested in our court.

A district court may not assume the authority or power to superintend or review the propriety of or supervise the judgment of another district court. *Pipkin*, 713 P.2d at 1360. Thus, even if a court enters an erroneous judgment, that judgment is not subject to collateral attack by another court of coordinate jurisdiction. *Closed Basin Landowners Ass'n v. Rio Grande Water Conservation Dist.*, 734 P.2d 627, 636–37 (Colo.1987). As a result, despite any merit the Denver District Court's analysis of the Arapahoe Order might have, its attempt to nullify the judgment of a court of concurrent jurisdiction is improper.

Denver's argument is flawed in another significant way. Denver proclaims that where a court acquires personal and subject matter jurisdiction in a particular case, any action by a court of concurrent jurisdiction involving the same parties and subject matter is precluded. *Miller*, 135 Colo. at 577, 313 P.2d at 999. That rule, however, is inapplicable to the instant situation. First, the parties in *People v. Christy* (the State of Colorado and the defendant that was state

---

11. In fact, there are a total of thirteen different judicial orders which have been issued relating to state-sentenced prisoners backlogged in county jails. The parties stipulated that the DOC would be unable to comply with all of those orders.

12. The Arapahoe Order in *Christy* was entered April 2, 1991, about four years after the Denver District Court's first order compelling the DOC to take state-sentenced prisoners from the Denver County Jail.

13. We note that the Arapahoe Order in *Christy* is not before us on review, nor was it appealed before becoming a final judgment. In any event, we decline to address that order at this time.

sentenced but then incarcerated in the Arapahoe County Jail) are not identical to those in *State ex rel. Dep't of Corrections v. Pena* (the State of Colorado, the Mayor of Denver, and other Denver officials). Therefore, the Denver District Court did not have jurisdiction over the placement of the defendant in *Christy* any more than the Arapahoe County District Court had jurisdiction over the Denver County Jail. Second, it has not been established that the subject matter of the two cases is identical. The Denver Order was a limited order relating only to the Denver County Jail, whereas the ruling in *Christy* purports to set up a comprehensive, statewide prioritization of the backlogged state-sentenced prisoners. Potentially, the Arapahoe District Court could validly invoke its jurisdiction over the parties and subject matter in *Christy* and exercise full judicial powers in that litigation without conflicting with the jurisdiction of the Denver District Court in the instant case. Because the Arapahoe Order is not before us today, however, we do not address whether that order was void insofar as it attempted to create a statewide prioritization scheme for removing state inmates from various county jails.

## V

In sum, although we uphold the Denver District Court's authority to enforce its lawful orders issued to remedy the emergency situation existing at the Denver County Jail, we cannot sanction its attempt to direct the DOC not to comply with the orders of a coordinate court, a fundamental shortcoming attendant with its ruling. Accordingly, we affirm the judgment of the court of appeals.

ERICKSON, J., concurs in part and dissents in part, and KIRSHBAUM and MULLARKEY, JJ., join in the concurrence and dissent.

Justice ERICKSON, concurring in part and dissenting in part:

I agree with the majority that the Denver District Court did not exceed its jurisdiction by ordering the Department of Corrections (DOC) to remove backlogged, state-sentenced prisoners from the Denver County Jail before it removed state-sentenced pris-

oners from other county jails. *See* maj. op. at 55–56. In *People v. Lockhart,* 699 P.2d 1332, 1336 (Colo.1985), we held that DOC officials are officers of the court for the limited purpose of taking custody of prisoners and that a district court has jurisdiction to direct DOC officials to take custody of such prisoners. Here, the Denver District Court, on September 28, 1987, issued a final order requiring the DOC to remove backlogged, state-sentenced prisoners from the Denver County Jail. The DOC failed to comply with the Denver District Court order and the Denver District Court properly exercised its jurisdiction to enforce that order in a contempt proceeding. *See id.; In re J.E.S.,* 817 P.2d 508, 511 (Colo.1991) (stating that the judiciary has the power to enforce its own judgments and orders). Accordingly, I would affirm the court of appeals holding that the Denver District Court may order the DOC to remove state-sentenced prisoners from the Denver County Jail prior to removing state-sentenced prisoners from other county jails.

I respectfully dissent from the holding in part IV of the majority opinion that the Denver District Court exceeded its jurisdiction by ordering the DOC to disregard the April 2, 1991, order entered by the Arapahoe County District Court in *People v. Christy,* No. 89CR77 (Arapahoe County Dist. Ct. Apr. 2, 1991) (Arapahoe Order). *See* maj. op. at 57–58. In my view, the Arapahoe Order was void insofar as it conflicted with the Denver District Court's September 28, 1987, order.

The Denver District court had jurisdiction over the DOC and the subject matter when it issued its September 28, 1987, order concerning removal of state-sentenced prisoners from the Denver County Jail. The Arapahoe County District Court entered its 1991 order setting up a system of statewide prioritization of backlogged, state-sentenced prisoners more than four years after the Denver District Court's order.

In *Public Service Co. v. Miller,* 135 Colo. 575, 313 P.2d 998 (1957), we established that the exercise of concurrent jurisdiction is controlled by the principle of priority, stating: It seems that hornbook law would prevent a conflict of decisions of two courts of concur-

rent jurisdiction and avoid unnecessary duplication and multiplicity of suits. It has long been settled that the court first acquiring jurisdiction of the parties and the subject matter has exclusive jurisdiction.

*Id.* at 577, 313 P.2d at 999; *see also Utilities Bd. of Lamar v. Southeast Colo. Power Ass'n,* 171 Colo. 456, 458, 468 P.2d 36, 37 (1970) ("It is familiar law that, once a court takes jurisdiction of an issue and of parties, it thereafter has exclusive jurisdiction of the subject and matters ancillary thereto.").

I agree with the cross-petitioners that "notwithstanding the existence of the Denver order, the Arapahoe County District Court entered an order which either conflicted with, changed or negated all or parts of the Denver order." Because the Denver District court first acquired jurisdiction over the parties and the subject matter, the Arapahoe County District Court lacked jurisdiction to modify the Denver District Court's order. Thus, the Arapahoe Order was void to the extent that it conflicted with the Denver District Court's order and the Denver District Court did not exceed its jurisdiction in enjoining the DOC from following the Arapahoe Order. Accordingly, I respectfully dissent from part IV of the majority opinion.

I am authorized to say that Justice KIRSHBAUM and Justice MULLARKEY join in this concurrence and dissent.